UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
COLLEEN EDWARDS,

                          Plaintiff,

             -against-

ESSAM KHALIL, individually,
RAMON BETHENCOURT, individually,
GREGORY METAKES, individually,
JOHN EWANCIW, individually,
JOSEPH DESTEFANO, individually,
EDWARD CUMMINGS, individually,
GENE T. VIGNOLA, individually,
MELISSA McCAREY, individually,
DAVID GREEN, individually, and
THE CITY OF MIDDLETOWN, New York,

                          Defendants.
-----------------------------------------------------X

**OPINION AND ORDER**

12 Civ. 8442 (JCM)

Plaintiff Colleen Edwards (formerly MacRae) ("Plaintiff") commenced this action

pursuant to: (i) 42 U.S.C. § 1983 ("Section 1983" or "§ 1983") for an alleged violation of the

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; (ii)

Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e-17) ("Title VII"); and

(iii) New York Human Rights Law (N.Y. Exec. Law §§ 290-301) ("NYHRL"), alleging that

defendants Essam Khalil ("Khalil" or "Sergeant Khalil"), Ramon Bethencourt ("Chief

Bethencourt"), Gregory Metakes ("Lieutenant Metakes"), John Ewanciw ("Lieutenant

Ewanciw"), Joseph DeStefano ("Mayor DeStefano"), Edward Cummings ("Commissioner

Cummings"), Gene T. Vignola ("Commissioner Vignola"), Melissa McCarey ("Commissioner

McCarey"), David Green ("Commissioner Green") and the City of Middletown, New York

("City of Middletown") (collectively, "Defendants") discriminated against her on the basis of her

gender, caused her to suffer a hostile work environment and retaliated against her because she complained of gender discrimination.

Presently before this Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] (Docket Nos. 46-49, 70-73). Plaintiff opposes the motion. (Docket Nos. 59-61, 63-64). For the reasons that follow, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND

Plaintiff is a City of Middletown police officer. After a seven-day disciplinary hearing in 2012 (the "First Disciplinary Hearing"), she was terminated from employment and filed this lawsuit. In 2013, she was reinstated with back pay and benefits pursuant to a successful Article 78 challenge.[2] In 2014, the City of Middletown began a second disciplinary hearing (the "Second Disciplinary Hearing") against Plaintiff—this hearing was cut short and a third disciplinary hearing (the "Third Disciplinary Hearing") began in November 2014. As far as the Court is aware, the Third Disciplinary Hearing is still ongoing and Plaintiff is currently suspended with pay. In the present action, Plaintiff contends that Defendants discriminated against her on the basis of gender, created a hostile work environment, and retaliated against her after she complained of gender discrimination. Viewed in the light most favorable to Plaintiff as the party opposing summary judgment, the parties' Rule 56.1 statements,[3] affidavits,

---

[1] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 17).

[2] Refers to a proceeding brought pursuant to Article 78 of the New York Civil Practice Law and Rules (N.Y. C.P.L.R. § 7801, *et seq.*).

[3] Refers to statements filed pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1").

affirmations,[4] depositions, disciplinary hearing transcripts and documents in the record reveal the

following events.[5]

## A.  The Parties

Plaintiff began serving as a police officer with the City of Middletown Police Department

(the "Department") in October 2007. (Plaintiff First Disc. Hr'g Tr.[6] at 1413-18).  Defendant City

of Middletown is a municipal corporate subdivision of the State of New York. (Complaint[7] ¶ 10).

Sergeant Khalil served as a police officer with the Department and was promoted to sergeant in

2010. (Khalil Dep.[8] at 21).  At all relevant times, Chief Bethencourt was the Department's chief

of police, (Bethencourt Dep.[9] at 7-10), and Lieutenant Metakes and Lieutenant Ewanciw were

lieutenants with the Department, (Metakes Dep.[10] at 7; Ewanciw Dep.[11] at 8, 12-13, 16).  During

---

[4] These affidavits and affirmations include: (i) Alex Smith's Affidavit in Support ("Smith Affirmation" or "Smith Aff.") (Docket No. 49), submitted in support of Defendants' motion; (ii) the Affirmation of Drita Nicaj in Opposition to Defendants' Motion for Summary Judgment ("Nicaj Affirmation" or "Nicaj Aff.") (Docket No. 59), submitted in support of Plaintiff's opposition brief; (iii) the Reply Affidavit of Alex Smith ("Smith Reply Aff.") (Docket No. 71), submitted in support of Defendants' reply brief; and (iv) the Reply Affidavit of Chief Bethencourt ("Bethencourt Reply Aff.") (Docket No. 72), submitted in support of Defendants' reply brief.

[5] On October 2, 2015, the Court granted Plaintiff's motion to partially seal Exhibits 69-77 and 79 to the Nicaj Affirmation (deposition transcripts that contain personnel information) and to entirely seal Exhibits 80-127 to the Nicaj Affirmation (personnel records of Sergeant Khalil and other members of the Department) on the grounds that the sealed material is covered by the parties' confidentiality agreement. (Docket No. 62; *see also* Docket No. 55). Many of the documents under seal contain sensitive and personal information about innocent third parties. The Court has made every effort to preserve the anonymity of the non-parties whose records are contained in these sealed exhibits.  The documents remain sealed except to the extent that they are excerpted in this Opinion and Order.

[6]  Refers to Plaintiff's testimony during the First Disciplinary Hearing. (Nicaj Aff. Ex. 65). During this hearing and in many of the underlying documents, Plaintiff is referred to as "Officer MacRae" or "PO MacRae."  She changed her last name from "MacRae" to "Edwards" sometime after the First Disciplinary Hearing. (*Id.* Ex. 66 at 4).

[7] Refers to Plaintiff's complaint filed in this action on November 19, 2012. (Docket No. 1).

[8] Refers to the deposition of Sergeant Khalil taken in this action. (Nicaj Aff. Ex. 69).

[9] Refers to the deposition of Chief Bethencourt taken in this action. (Nicaj Aff. Ex. 70).

[10] Refers to the deposition of Lieutenant Metakes taken in this action. (Nicaj Aff. Ex. 71).

[11] Refers to the deposition of Lieutenant Ewanciw taken in this action. (Nicaj Aff. Ex. 72).

the relevant time period, Lieutenant Ewanciw was also the Bureau Commander of Operations, which means he completed "tasks such as . . . internal investigations." (Ewanciw Dep. at 8).  At all times relevant to the Complaint, Mayor DeStefano was the mayor of the City of Middletown and served as a member and president[12] of the City of Middletown Board of Police Commissioners (the "Board"). (Destefano Dep.[13] at 8, 44; City of Middletown Charter[14] § 128). The Board consists of five members and has the power to, *inter alia*, punish Department police officers for violating Department regulations. (City of Middletown Charter §§ 128, 129(5)). Commissioner Cummings, Commissioner Vignola, Commissioner McCarey and Commissioner Green were the other four members of the Board at the time of Plaintiff's termination in 2012. (Cummings Dep.[15] at 7-8; Vignola Dep.[16] at 7; McCarey Dep.[17] at 9-10; Green Dep.[18] at 7-8).

## B.  The Sexual Advance in 2008

When Plaintiff started working at the Department, she developed a "friendly relationship" with Khalil, who was a fellow police officer at the time. (Plaintiff First Disc. Hr'g Tr. at 1476-79).  Plaintiff socialized with Khalil and his wife outside of work. (*Id.* at 1476-79).  However, sometime towards the end of 2008, while Plaintiff and Khalil were in his car together, Khalil put

---

[12] Mayor DeStefano refers to himself as the "chairman of the police commission," (DeStefano Dep. at 8), but his official title pursuant to the City of Middletown Charter is "President" of the Board, (City of Middletown Charter § 128).  Any distinction is irrelevant here.

[13] Refers to the deposition of Mayor DeStefano taken in this action. (Nicaj Aff. Ex. 73).

[14] Nicaj Aff. Ex. 49.

[15] Refers to the deposition of Commissioner Cummings taken in this action. (Nicaj Aff. Ex. 74).

[16] Refers to the deposition of Commissioner Vignola taken in this action. (Nicaj Aff. Ex. 75).

[17] Refers to the deposition of Commissioner McCarey taken in this action. (Nicaj Aff. Ex. 76).

[18] Refers to the deposition of Commissioner Green taken in this action. (Nicaj Aff. Ex. 77).

his hand on Plaintiff's leg, kissed her neck and tried to kiss her on the mouth. (*Id.* at 1479-81; Plaintiff Dep.[19] at 23).  Plaintiff "told him no." (*Id.*).  Following this incident, Plaintiff stopped speaking and texting with Khalil outside of work and deleted him from her Facebook account. (Plaintiff First Disc. Hr'g Tr. at 1482-84).  She continued to speak with him as a co-worker about "business only." (*Id.* at 1488-89).[20]

Sergeant Khalil denies that he ever attempted to kiss Plaintiff. (Khalil Dep. at 153; Khalil Third Disc. Tr.[21] at 1289-90).

## C.  The Facebook Violation in or around April 2010 and Plaintiff's Four-Hour Suspension

In or around April 2010, Chief Bethencourt found printouts of some of Plaintiff's Facebook photographs "under the door" of his office, (Bethencourt Dep. at 76), and he advised Plaintiff that she was going to be disciplined for posting those photographs on Facebook, (Plaintiff First Disc. Hr'g Tr. at 1490).  Plaintiff admits that the postings were "technically a violation" of Department policy, (Plaintiff's Rule 56.1 Counter-Statement[22] ¶ 32), but states that other members of the Department also violated the policy without being disciplined, (Plaintiff First Disc. Hr'g Tr. at 1492-93).  By disposition dated April 30, 2010, Plaintiff agreed to a four-hour suspension (to be served as a loss of personal time) for this violation in lieu of facing formal charges and a hearing before the Board. (*Id.* at 1490-92; Smith Aff. Ex. 2).

---

[19] Refers to the deposition of Plaintiff taken in this action. (Nicaj Aff. Ex. 68).

[20] There was one exception where Plaintiff asked Sergeant Khalil to speak to her ex-boyfriend Christopher Nielson ("Officer Christopher Nielson"), a fellow officer and Sergeant Khalil's close friend, after Officer Christopher Nielson made an inappropriate comment to her at work. (Plaintiff Dep. at 53).

[21] Refers to Sergeant Khalil's testimony during the Third Disciplinary Hearing. (Supplement to Smith Aff.).

[22] Refers to Plaintiff's Counter-Statement of Facts Pursuant to Local Rule 56.1. (Docket No. 63).

**D.  The "Good Morning" Incident in or around April 2010**

Around that same time period, Sergeant[23] Khalil confronted Plaintiff for not saying "good morning" and "good night" to him and asked Plaintiff why she was not speaking to him. (Plaintiff First Disc. Hr'g Tr. at 1489).  She responded: "You know why I am not talking to you"—*i.e.*, referring to the incident in Khalil's car in 2008. (*Id.* at 1493-94; Plaintiff's Rule 56.1 Counter-Statement ¶ 35).  She told him that she also believed he was the person who reported her Facebook violation to Chief Bethencourt. (Plaintiff First Disc. Hr'g Tr. at 1493).  At the end of their conversation, Sergeant Khalil ordered Plaintiff: "You will say good morning, Sergeant Khalil, and you will say good night, Sergeant Khalil, is that clear?" (*Id.* at 1494-95).  Plaintiff immediately complained to Lieutenant George Booth ("Lieutenant Booth"), who said that he would talk to Sergeant Khalil. (*Id.* at 1496-97).  A day or two later Sergeant Khalil stopped Plaintiff in the hallway and waited for her to say "good morning." (*Id.* at 1497-98).  When Plaintiff went back to Lieutenant Booth, he said that he had not yet talked to Sergeant Khalil but would, and that "it should stop." (*Id.* at 1498-99).

Sergeant Khalil disputes this version of events.  He claims that he did not direct Plaintiff to say good morning but instead merely inquired as to "why she was being very disrespectful"—*i.e.*, why she would give him an "angry face" and "walk out like [he] didn't exist" when he said "good morning." (Khalil Dep. at 140-42).  Sergeant Khalil also testified that during their conversation Plaintiff stated "that she hates [his] guts" and that "if [he] tried to make her do anything she [didn't] want to do, [she was] going to make [his] life . . . a living hell." (*Id.* at 143-44).

---

[23] Khalil was promoted to sergeant in 2010. (Khalil Dep. at 21).

6

**E.  The "Arrest Box" Incident a Few Weeks Later**

A few weeks after the "good morning" incident, Sergeant Khalil told Plaintiff that she had forgotten to mark off the arrest box on her paperwork. (Nicaj Aff. Ex. 3).  She advised him that Lieutenant Ewanciw had told her to leave the arrest box blank when she did not have any arrests. (*Id.*).  Sergeant Khalil "became angry" and his "hands and arms start[ed] to shake." (*Id.*). When Plaintiff protested, Sergeant Khalil yelled: "just do it." (*Id.*).

**F.  The "Fingernail" Incident on December 16, 2010**

On December 16, 2010, Plaintiff advised Sergeant Khalil that she was having a problem unloading the last two rounds of her shotgun. (Plaintiff First Disc. Hr'g Tr. at 1503-04). Sergeant Khalil unloaded the shotgun and walked away without saying anything. (*Id.* at 1504). Sergeant Khalil then sent an email to Plaintiff, copying her supervisors, stating that he believed that she was unable to unload the shotgun "due to [her] fingernails being more than ¼' in length beyond [her] fingertips in direct violation of" Department policy. (*Id.* at 1505; Nicaj Aff. Ex. 1) (altered from original).  Upon receiving this email, Plaintiff immediately turned to Lieutenant Booth and showed him that her fingernails were at the end of her fingertips. (Plaintiff First Disc. Hr'g Tr. at 1505-06).

Pursuant to Sergeant Khalil's request, Plaintiff subsequently went to training at the Department's indoor range with Sergeant Aaron Welch ("Sergeant Welch"),[24] who is a certified firearms instructor. (Plaintiff First Disc. Hr'g Tr. at 1508; Welch Third Disc. Hr'g Tr.[25] at 1671). Sergeant Welch testified that he thought that Plaintiff's difficulty was "[p]rimarily . . . a matter

---

[24] Plaintiff refers to Welch as "Sergeant Welch" while Defendants refer to him as "Lieutenant Welch."  Welch's precise title is not relevant here, and the Court will refer to him as "Sergeant Welch."

[25] Refers to Sergeant Welch's testimony during the Third Disciplinary Hearing. (Supplement to Smith Aff.).

of finger strength, finger placement" but noted that Plaintiff "did have a small portion of fingernail exceeding the tip of her finger which [he] felt was complicating her finger strength issue." (*Id.* at 1677).  Plaintiff disputes that Sergeant Welch said this. (Plaintiff First Disc. Hr'g Tr. at 1508-08).

## G.  The "Clothes Change" Incident on December 27, 2010

On December 27, 2010, Plaintiff turned in a criminal mischief report at the end of her shift and then changed into her civilian clothing. (Nicaj Aff. Ex. 3; Plaintiff's Rule 56.1 Response[26] ¶ 39). When she returned, Sergeant Khalil asked why Plaintiff had changed into civilian clothing and told her: "[you] will change when I tell you to change, is that clear?" (Nicaj Aff. Ex. 3).  Plaintiff felt that Sergeant Khalil did not give her "the ability to explain [herself] or to . . . apologize for the misunderstanding" and that he was "talking down" to her. (*Id.*).

Under Sergeant Khalil's version of events, Plaintiff had not turned in the criminal mischief report when he observed Plaintiff leaving the station in civilian clothes. (Khalil Third Disc. Hr'g Tr. at 953-55).  He told her that she was not to leave for the day without turning in the report or obtaining permission to leave, and that she was not to change into civilian clothes until any and all paperwork had been completed. (*Id.* at 955-56).  He stated that Plaintiff was "very sarcastic and disrespectful" during their conversation and that she did not complete the criminal mischief report that day. (*Id.* at 956-57).

## H.  The "Desk Duty" Incident in or around February 2011

Plaintiff testified that in or around February 2011, Sergeant Khalil advised female officers on the midnight to 8:00 a.m. shift that he was going to assign female officers to desk duty on weekends and male officers on patrol. (Plaintiff Dep. at 63).  It does not appear that

---

[26] Refers to Plaintiff's Response to Defendants' Statement Pursuant [sic] Local Civil Rule 56.1. (Docket No. 60).

Plaintiff was present when Sergeant Khalil allegedly made this statement. *See, e.g.*, Complaint ¶ 29 (stating that Plaintiff "learn[ed] of Khalil's February 2011 directive to female police officers ordering them to desk duty on weekends."). Two female officers informed Plaintiff that another sergeant was present at the time of Sergeant Khalil's alleged statement and contacted them afterwards to see if they had any issues with the statement. (Plaintiff Dep. at 63). Plaintiff reported Sergeant Khalil's purported statement to Lieutenant Mark Schuh ("Lieutenant Schuh"), who said that he was going to bring it to the attention of Lieutenant Metakes and Lieutenant Ewanciw. (*Id.* at 65-66).

## I.  The "Paperwork" Incident on March 5, 2011

On March 5, 2011,[27] Plaintiff completed a domestic incident arrest with another police officer, George Nielson ("Officer Nielson"). (Plaintiff First Disc. Hr'g Tr. at 1510). They made the arrest around midnight and decided that only Officer Nielson would stay past the end of their shift to complete the paperwork. (*Id.* at 1510-12). Plaintiff went to change into civilian clothes. (*Id.* at 1515). While Plaintiff was changing, Officer Nielson knocked on the door and informed her that Sergeant Khalil (who had come on duty at midnight) wanted her to complete a supplemental report on the arrest. (*Id.* at 1513, 1515). When Plaintiff went to hand her supplement and overtime slip to Sergeant Khalil, he yelled at her for changing into civilian clothes and told her that the paperwork was wrong. (*Id.* at 1518). Sergeant Khalil then called Lieutenant Schuh who advised that some of the language in the paperwork needed to be changed, but that the charges were correct. (*Id.* at 1521-22). At this point, Sergeant Khalil appeared visibly "frustrated." (*Id.* at 1522). When Plaintiff came back with her overtime slip, Sergeant

---

[27] This incident began on March 4, 2011 and continued through the early morning hours of March 5, 2011. For ease of reference, the Court will refer to the incident as occurring on March 5, 2011.

Khalil told her to "get out."  She asked: "You are not going to sign my overtime slip?" and

Sergeant Khalil replied: "Just get out." (*Id.* at 1523).

Sergeant Khalil disputes this version of events and notes that Plaintiff "became very

disruptive," was "yelling," and "was basically being insubordinate." (Khalil Third Disc. Hr'g Tr.

at 979).

## J.  Plaintiff's March 8, 2011 Complaint and the "Taser" Incident on March 10, 2011

On her next day of work, March 8, 2011, Plaintiff reported the March 5, 2011

"paperwork" incident to Lieutenant Schuh and made a formal complaint to Lieutenant Ewanciw

regarding Sergeant Khalil's conduct. (Plaintiff First Disc. Hr'g Tr. at 1524).  Two days later, on

March 10, 2011, Plaintiff again encountered Sergeant Khalil. (*Id.* at 1531).  Sergeant Khalil

asked Plaintiff where her taser was, and Plaintiff explained that she had checked twice and there

was no taser available for her to take out on patrol. (*Id.* at 1531-32).  As she was leaving the

station, Sergeant Khalil ordered Plaintiff to come back and, in a "condescending" manner, told

her that there was a taser available in the locker. (*Id.* at 1532).  Plaintiff went to Lieutenant

Ewanciw's office and requested to go home. (*Id.*).  She was upset and crying, and she advised

Lieutenant Ewanciw that she felt that Sergeant Khalil was "retaliat[ing]" against her for making

a formal complaint against Sergeant Khalil and that she could "no longer work with Sergeant

Khalil." (Ewanciw Dep. at 68; Ewanciw Second Disc. Hr'g Tr.[28] at 243-44).

## K.  The Investigation into Plaintiff's March 8, 2011 Complaint

Lieutenant Ewanciw initiated an investigation into Plaintiff's formal complaint on March

8, 2011. (Ewanciw Third Disc. Hr'g Tr.[29] at 78-79).  That same day, Lieutenant Ewanciw

---

[28] Refers to Lieutenant Ewanciw's testimony during the Second Disciplinary Hearing. (Nicaj Aff. Ex. 66).

[29] Refers to Lieutenant Ewanciw's testimony during the Third Disciplinary Hearing. (Supplement to Smith Aff.).

interviewed Plaintiff to have her explain "why she felt that she was being harassed by Sergeant Khalil." (*Id.* at 88-89).  Lieutenant Ewanciw also interviewed Plaintiff two additional times. (Plaintiff First Disc. Hr'g Tr. at 1525).  Chief Bethencourt was present for at least a portion of all three of Plaintiff's interviews, and Plaintiff states that he was "very hostile" towards her. (*Id.* at 1525-27).  During one of the interviews, Plaintiff told Lieutenant Ewanciw and Chief Bethencourt[30] about Sergeant Khalil's 2008 sexual advance. (Plaintiff Dep. at 29-36). Lieutenant Ewanciw testified that he thought Plaintiff disclosed this information during the March 8, 2011 interview. (Ewanciw Second Disc. Hr'g Tr. at 630).  He did not make a written record of her disclosure, but he did discuss it with Lieutenant Metakes and Chief Bethencourt. (Ewanciw First Disc. Hr'g Tr.[31] at 1918).

At Lieutenant Ewanciw's request, Plaintiff also submitted a further (undated) memorandum documenting her complaints against Khalil. (Ewanciw Third Disc. Hr'g Tr. at 92; Nicaj Aff. Ex. 3).  In this memorandum, Plaintiff recounted some of her negative encounters with Sergeant Khalil, including: (1) the Facebook violation / "good morning" incident in or around April 2010; (2) the "arrest box" incident a few weeks later; (3) the "fingernail" incident on December 16, 2010; (4) the "clothes change" incident on December 27, 2010; and (5) the "paperwork" incident on March 5, 2011. (Nicaj Aff. Ex. 3).  She wrote that Sergeant Khalil's "hands and arms began to shake" and that she "felt uncomfortable and belittled" during the "good morning" incident, and she used similar terminology in describing the other incidents. (*Id.*).

---

[30] Lieutenant Metakes may also have been present. (Plaintiff Dep. at 32).

[31] Refers to Lieutenant Ewanciw's testimony during the First Disciplinary Hearing. (Nicaj Aff. Ex. 65).

Lieutenant Ewanciw also requested memoranda from witnesses to the March 5, 2011 "paperwork" incident and the March 10, 2011 "taser" incident. (Ewanciw Third Disc. Hr'g Tr. at 86). He received memoranda from: Lieutenant Schuh (dated March 9, 2011), (*id.*; Smith Aff. Ex. 4); Dispatcher Sparling (dated March 10, 2011), (Smith Aff. Ex. 8); Dispatcher Bane (dated March 10, 2011), (Smith Aff. Ex. 10); Sergeant Khalil (dated March 12, 2011), (Smith Aff. Ex. 5); Officer Joseph Festa, (dated March 13, 2011) (Smith Aff. Ex. 9); and Officer Cunningham, (dated March 14, 2011) (Smith Aff. Ex. 7).

In his memorandum, Sergeant Khalil detailed a series of incidents he had had with Plaintiff since January 2010, including the "good morning" incident, the "fingernail" incident, the "clothes change" incident, the "paperwork" incident, and the "taser" incident. (Smith Aff. Ex. 5). He then requested that "a formal investigation be conducted in regard to all of the above incidents." (*Id.* at 6).

Lieutenant Schuh detailed in his memorandum the history he had documented between Sergeant Khalil and Plaintiff, including: (i) his May 8, 2010 discussion with Sergeant Khalil regarding the "good morning" incident, in which the two "discussed the need to pick one's battles extensively;" (ii) his May 14, 2010 discussion with Sergeant Khalil regarding a similar "good morning" incident with (female) Officer Sommer; (iii) his conversations with both Plaintiff and Sergeant Khalil regarding the "fingernail" incident; and (iv) his calls with Sergeant Khalil during the "paperwork" incident. (Smith Aff. Ex. 4). Lieutenant Schuh further documented his March 8, 2011 interview with Plaintiff regarding: (i) the aforementioned issues; (ii) Plaintiff's belief that Sergeant Khalil was the person who got her in trouble for the Facebook violation in April 2010; (iii) Plaintiff's belief that Sergeant Khalil also picked on Officer Sommer, which was based in part on seeing Officer Sommer crying in the locker room because

12

of Sergeant Khalil; and (iv) Plaintiff's belief that Sergeant Khalil told others that he "wanted to put women on the desk so that only the men would be on the road for the summer," which Plaintiff said she learned through Officer Sommer. (*Id.*).

Lieutenant Ewanciw concluded his investigation on March 18, 2011 and recorded his findings in a report to Chief Bethencourt, dated March 18, 2011. (Ewanciw First Disc. Hr'g Tr. at 1901-02; Nicaj Aff. Ex. 17).  In that report, Lieutenant Ewanciw recounted his understanding of four incidents that Plaintiff referenced during her March 8, 2011 interview: the "good morning" incident; the "fingernail" incident; the "clothes change" incident; and the "paperwork" incident. (Nicaj Aff. Ex. 17).  He further documented Plaintiff's statement that she and Sergeant Khalil "use[d] to be personal friends outside of work, but . . . had a falling out, prior to him being promoted to Sergeant," that she feels that Sergeant Khalil was "responsible for her being suspended in 2010 for posting work related material on her personal Face Book page," and that "due to these two incidents she has lost respect for Sgt. Khalil as a person." (*Id.* at 3).  Lieutenant Ewanciw also wrote in the report that he asked Plaintiff "if she felt this was a case of Sexual Harassment, to which she made it very clear that she did not feel that it was, and also indicated that she has observed Sgt. Khalil address other Police Officers in the same manor [sic] as he does her." (*Id.*).  Lieutenant Ewanciw's report also included documentation of his March 9, 2011 interview with Sergeant Khalil, his March 11, 2011 interview with Officer Sommer, his interaction with Plaintiff following the March 10, 2011 "taser" incident and an overview of the memoranda that various witnesses had submitted during the investigation pursuant to his request. (*Id.* at 3-4).  After reviewing all of the evidence, Lieutenant Ewanciw noted that Plaintiff was "much more respectful and accepting of feedback . . . that comes from other Supervisors" and concluded that this was a "personal issue" between Plaintiff and Sergeant Khalil. (*Id.* at 3).  He

recommended that Sergeant Khalil receive training on how to communicate with his subordinates and classified Plaintiff's complaint as "Unfounded." (*Id.* at 4-5; *see also* Ewanciw Dep. at 195-96).

By letters dated March 25, 2011, Chief Bethencourt informed both Plaintiff and Sergeant Khalil that a "thorough investigation" had been completed and that Plaintiff's complaint against Sergeant Khalil was "Unfounded." (Nicaj Aff. Exs. 18, 19).

## L.  The June 10, 2011 "Late Memorandum" Incident

On June 10, 2011, Plaintiff came in to work for a sixteen-hour shift. (Plaintiff First Disc. Hr'g Tr. at 1535-36; Nicaj Aff. Ex. 22).  Sergeant Khalil asked her to correct a memorandum that she had prepared "over a month prior" regarding damage to a police vehicle. (Plaintiff First Disc. Hr'g Tr. at 1536).  Minutes before her shift finished, Sergeant Khalil told her to finish the memorandum that day and she replied that she could not finish it during her shift. (*Id.* at 1537).  Plaintiff then attended a briefing, and afterwards Sergeant Khalil stopped Plaintiff in the hallway and told her not to change into civilian clothes. (*Id.*).  When she responded: "It's the end of my tour," Sergeant Khalil walked away. (*Id.*).

Sergeant Khalil's version of the events differs.  He states that he gave Plaintiff "a time frame," told her that he "would be back on the midnight shift," and said that she was to "leave it"—*i.e.*, the corrected memorandum—in his mailbox. (Khalil Third Disc. Hr'g Tr. at 1004-05).  When he came back to work and did not find the corrected memorandum in his mailbox, he went to Plaintiff, explained that it was "only a two-minute correction" and said "please do it before you leave." (*Id.* at 1005-06).  He further stated: "do not leave until you give me the memo." (*Id.* at 1007).  When he encountered Plaintiff later in the hallway, he told her not to leave and she said "nope, my shift ended and I am going home." (*Id.* at 1008).  Sergeant Khalil then went and

spoke with Lieutenant Graziano and Sergeant Tobin "to notify them of what took place" and of Plaintiff's "insubordination." (*Id.*). They told Sergeant Khalil to document the incident and said they would address it at a later time. (*Id.* at 1009).

## M.  The Investigation into the June 10, 2011 "Late Memorandum" Incident and Plaintiff's Three-Day Unpaid Suspension

During Plaintiff's next shift on June 13, 2011, Lieutenant Ewanciw and Lieutenant Metakes asked her about the June 10, 2011 "late memorandum" incident. (Plaintiff First Disc. Hr'g Tr. at 1538). They told her that she should have completed the memorandum as soon as Sergeant Khalil asked for it. (*Id.* at 1539). When Plaintiff responded that she did not like the way that Sergeant Khalil spoke to her and that he gets her "very emotionally upset," the two lieutenants responded that they have "had worse." (*Id.*). By letters dated the same day, Plaintiff submitted the corrections that Sergeant Khalil had requested and a memorandum to Lieutenant Ewanciw regarding the "late memorandum" incident. (Nicaj Aff. Exs. 22, 23).

By letter dated June 17, 2011, Lieutenant Ewanciw informed Chief Bethencourt that he had received a memorandum and a phone call from Sergeant Khalil reporting that Plaintiff had engaged in "insubordination" on June 10, 2011. (Nicaj Aff. Ex. 24). Lieutenant Ewanciw documented both Sergeant Khalil's and Plaintiff's versions of the events in his letter. (*Id.*). He also said that "it was made very clear to [Plaintiff] that Sgt. Khalil is a Supervisor and even if she does not personally like him or she is not working for him directly she is still obligated to respect his rank and to do as he asks, when he asks, as she would for any other Supervisor." (*Id.*). Lieutenant Ewanciw then wrote that during the incident Plaintiff had "directly violated" Department policies on general standards of conduct, unbecoming conduct, insubordination, and departmental reports, and he recommended that Plaintiff be suspended for "not less than three days." (*Id.*).

In July 2011, Plaintiff attended a meeting with Chief Bethencourt regarding the June 10, 2011 "late memorandum" incident. (Plaintiff First Disc. Hr'g Tr. at 1539, 1542). Plaintiff was represented by attorney John Grant ("Attorney Grant"). (*Id.* at 1539). At the meeting, Chief Bethencourt told Plaintiff to sign a disposition agreeing to a three-day penalty for the June 10, 2011 incident. (*Id.* at 1539-40). When Plaintiff said that she had a problem with what was written in the agreement, Chief Bethencourt "became extremely irate" and told Attorney Grant to have Plaintiff sign the agreement. (*Id.* at 1541). Attorney Grant voiced at the meeting that he thought the three-day penalty was "excessive" and "[r]idiculous." (Grant Dep.[32] at 8). He also testified that Chief Bethencourt "raised his voice" and exhibited "abusive" and "demeaning" conduct, and that "it was an unusually heated inquiry by [a] chief of police." (*Id.* at 12-13). This kind of behavior was something Attorney Grant "hadn't seen [in] 20 years in meetings with chiefs," (*id.* at 23), and his understanding was that the interview was "heated" because Chief Bethencourt had a "close personal relationship with Sergeant Khalil," (*id.* at 13-14). In the end, Attorney Grant advised Plaintiff to sign the agreement because if she did not she would have to take a 30-day unpaid suspension and then "take her chances" in front of the Board which, in his view, was biased towards Chief Bethencourt. (*Id.* at 24-26). Plaintiff did thereafter sign a disposition agreeing to a three-day unpaid suspension because she did not feel that she "had a choice." (Plaintiff First Disc. Hr'g Tr. at 1541; Nicaj Aff. Ex. 27).

## N. The "Wrong Subsection" Incident on October 31, 2011

On the night of October 30, 2011,[33] Plaintiff learned that she was going to have to interact with Sergeant Khalil, whose shift was starting at midnight, and she was "worried."

---

[32] Refers to the deposition of Attorney Grant taken in this action. (Nicaj Aff. Ex. 78).

[33] Plaintiff's interactions with Sergeant Khalil began after midnight—*i.e.*, on October 31, 2011. For ease of reference, the Court will refer to this incident as occurring on October 31, 2011.

(Plaintiff First Disc. Hr'g Tr. at 1543-48). Earlier in the night a man had come in and reported that his car was stolen while he was fighting with his girlfriend at a bar. (*Id.* at 1546-47). The man then admitted that this story was a lie and Lieutenant Schuh instructed Plaintiff to charge the man with falsely reporting a stolen vehicle. (*Id.* at 1547). When Plaintiff brought her paperwork from this arrest to Sergeant Khalil, he told her that she had charged the suspect with the wrong subsection of the New York Penal Code ("N.Y. Penal Code"). (*Id.* at 1549-55). She admits "that she had made a clerical error by entering subsection 4 instead of subsection 3." (Plaintiff's Rule 56.1 Counter-Statement ¶ 111). Plaintiff then reviewed the N.Y. Penal Code, decided that subsection two was actually the most appropriate charge, and revised her paperwork accordingly. (Plaintiff First Disc. Hr'g Tr. at 1556-57). Sergeant Khalil reviewed the paperwork and told Plaintiff: "The charge isn't right, it's not Sub 2, it's Sub 1." (*Id.* at 1557-60). Plaintiff said that she did not understand how subsection one fit the situation, and Sergeant Khalil replied "[j]ust do Subsection 1" and walked away. (*Id.* at 1560-62).

Plaintiff followed Sergeant Khalil into the dispatch room, where two other officers were sitting, and again stated that she did not know how subsection one applied. (Plaintiff First Disc. Hr'g Tr. at 1562-63). Sergeant Khalil told her to read subsection one out loud. (*Id.* at 1564). After she did, he said "[y]ou are reading it wrong" and read it out loud himself, emphasizing the word "or." (*Id.* at 1565). He then interrupted Plaintiff repeatedly and said: "[i]f you are not going to do it, you are being insubordinate." (*Id.*). At that point Plaintiff remembered that Sergeant Khalil had charged her with insubordination just a few months earlier, and she started to cry, saying "I am not trying to be insubordinate, I just don't understand." (*Id.* at 1565-66). Sergeant Khalil said: "If you are not going to do it, just let him go" and then repeated: "Just let him go." (*Id.* at 1566). Plaintiff walked out crying and released the suspect. (*Id.* at 1572). About

17

twenty minutes later Sergeant Khalil came back and told Plaintiff to charge the suspect with subsection three of the relevant provision. (*Id.* at 1574-75). He also told her to leave the paperwork on his desk before she left, which she did. (*Id.* at 1577-78). This paperwork included a report stating that Sergeant Khalil had told her to release the suspect. (Nicaj Aff. Ex. 28).

Sergeant Khalil has a different version of the night's events. He claims that Plaintiff was "becoming very belligerent and very disrespectful" and that he eventually told her that he was okay with charging either subsection one or subsection three. (Khalil Third Disc. Hr'g Tr. at 1058). He also testified that when Plaintiff asked if she should release the suspect, he said "no," and that she then "walked out and released the suspect without [his] authority." (*Id.* at 1064-65). Sergeant Khalil saw Plaintiff release the suspect, but he did not do or say anything to her because he "was in shock" and he did not want to get into the legal issue of re-arresting the suspect after he had been released. (*Id.* at 1066-67). Sergeant Khalil also noted that he asked Plaintiff to submit a "Domestic Incident Report" as part of the arrest paperwork, but she did not do so. (*Id.* at 1052, 1066, 1077).

## O. Plaintiff's Complaint Regarding the October 31, 2011 "Wrong Subsection" Incident and Lieutenant Metakes' Subsequent Investigation

After finishing her shift, Plaintiff met with Lieutenant Metakes about this incident. (Plaintiff First Disc. Hr'g Tr. at 1579). Pursuant to Lieutenant Metakes' request, Plaintiff later submitted a memorandum, dated November 7, 2011, detailing the night's events. (Nicaj Aff. Ex. 30). The memorandum included a statement that this "can be added to the numerous documented incidents in the past where Sgt. Khalil has intentionally put me through unnecessary emotional abuse at work with his degrading and discriminating behavior which has created a hostile work environment." (*Id.* at 6; Plaintiff First Disc. Hr'g Tr. at 1587). Plaintiff did not

specifically indicate in this memorandum that the harassment was because of her gender. (Plaintiff Dep. at 75).

Lieutenant Metakes investigated the incident and recorded his findings in a memorandum dated November 25, 2011. (Smith Aff. Ex. 19).  In the memorandum, Lieutenant Metakes documented his communications with Plaintiff and Sergeant Khalil regarding the incident and indicated that he reviewed memoranda from Plaintiff, Sergeant Khalil, and three witnesses: Officer Artola, Officer Beebe and Officer Beaudette.  The memorandum stated that "it appears that Sgt. Khalil may have wanted [Plaintiff] to charge a subsection . . . that did not fit the offense," but concluded that "[w]hile Sgt. Khalil's interpretation of the law may have been faulty, [Plaintiff's] response to the interpretation appears to be insubordinate." (*Id.* at 2).

**P.  The December 2011 Internal Investigation**

In December 2011, Plaintiff received a letter stating that she was the subject of an internal investigation and ordering her to come in for an interview on December 21, 2011. (Plaintiff First Disc. Hr'g Tr. at 1587).  Plaintiff went in for the interview on December 21, 2011, represented by Attorney Grant. (*Id.* at 1587-88).  Also present at the interview were Chief Bethencourt, Lieutenant Ewanciw, Lieutenant Metakes and counsel for the City of Middletown. (*Id.* at 1588).  The interview lasted over three hours. (*Id.* at 1590).  The day after this interview, Chief Bethencourt directed Lieutenant Schuh to submit a memorandum concerning the October 31, 2011 "wrong subsection" incident, which he did. (Nicaj Aff. Ex. 36).

In January 2012, Attorney Grant advised Plaintiff that Defendants were offering her a five-day suspension and a five-day loss of vacation time in connection with the October 31, 2011 incident. (Plaintiff First Disc. Hr'g Tr. at 1603; Exhibit 27 at 2).  Plaintiff refused the penalty. (*Id.*).

**Q.  The April 6, 2012 "Warrant Check" Incident and Plaintiff's Placement on Administrative Leave**

On April 6, 2012, Plaintiff received a call regarding a suspect with a possible outstanding warrant. (Plaintiff First Disc. Hr'g Tr. at 1607).  Plaintiff testified that, for safety reasons, the procedure is to "always have another officer" present when conducting a warrant check. (*Id.* at 1618).  However, when Plaintiff saw the suspect alone she apprehended him by herself. (*Id.* at 1610-1616).  The entire incident took about three-and-a-half minutes. (*Id.* at 1617).

At Chief Bethencourt's request, Plaintiff submitted a memorandum, dated April 11, 2012, regarding the April 6, 2012 apprehension. (Plaintiff First Disc. Hr'g Tr. at 1621; Nicaj Aff. Ex. 40).  She asked Chief Bethencourt if there had been any complaints and he said "no." (Plaintiff First Disc. Hr'g Tr. at 1623).  By letter dated April 12, 2012, Chief Bethencourt placed Plaintiff on "full paid Administrative Leave" until the "investigation that was commenced against [her was] completed" and stated that Plaintiff was prohibited from entering the Department building "**as an employee** unless [she received] prior consent from the Chief of Police." (Nicaj Aff. Ex. 44) (emphasis in original).

**R.  The April 17, 2012 Letter from Plaintiff's Counsel**

By letter dated April 17, 2012, Plaintiff's counsel Drita Nicaj ("Attorney Nicaj") wrote to Chief Bethencourt stating that she intended to file a charge of discrimination against the City of Middletown with the Equal Employment Opportunity Commission (the "EEOC Charge") for discrimination and retaliation against Plaintiff for exercising her rights under Title VII. (Nicaj Aff. Ex. 45).  Plaintiff filed the EEOC Charge on or about the same day. (Complaint ¶ 2).  The Board met on April 19, 2012 and discussed Attorney Nicaj's letter in executive session. (Nicaj Aff. Ex. 46).

**S.  The First Disciplinary Hearing and the Board's Decision to Terminate Plaintiff**

By notice dated May 9, 2012, Chief Bethencourt issued disciplinary charges against Plaintiff for her conduct during the October 31, 2011 "wrong subsection" incident and the April 6, 2012 "warrant check" incident. (Nicaj Aff. Ex. 47).  The First Disciplinary Hearing was held regarding these disciplinary charges, with seven days of proceedings on May 24, 2012; June 5, 2012; June 12, 2012; June 23, 2012; July 1, 2012; July 10, 2012 and July 13, 2012. (Smith Aff. Ex. 32 at 3; *see also* Nicaj Aff. Ex. 65).  By decision dated November 8, 2012, the Board informed Plaintiff that it had found that she was not guilty of any charges relating to the April 6, 2012 "warrant check" incident, but was guilty of certain charges relating to the October 31, 2011 "wrong subsection" incident. (Smith Aff. Ex. 32 at 15-16).  In particular, Plaintiff was found guilty of "neglect of official duty and/or some delinquency seriously affecting your general character or fitness for the office" for the following conduct on October 31, 2011:

> (1) "despite being given a directive by a superior officer to revise a specified charge in an arrest of a defendant, you violated that directive when you refused and/or failed to revise the specified charge;"
>
> (2) "despite being given a directive by a superior officer to continue working on a case assigned to you, you violated that directive when you refused to continue to work on that case;"
>
> (3) "despite being given a directive by a superior officer to re-interview a defendant regarding a possible domestic incident, you violated that directive by failing to conduct the interview;"
>
> (4) "in the presence of other officers and/or a defendant, you refused to follow the direction of a superior officer until a senior officer was present;"
>
> (5) "in the presence of other officers and/or a defendant, you, while discussing a case with a superior officer, turned your back on the officer and left the room without being excused by that officer;" and
>
> (6) "your conduct as described . . . above: (a) violated the AGO-014-11 (General Standards of Conduct); and/or (b) impeded the operations of the Middletown Police Department."

(*Id.* at 1-2, 15-16) (altered from original).  The Board's decision noted that while Plaintiff's performance evaluations "generally have been positive, the evaluations also noted two negative trends: she needed improvement in accepting feedback from superior officers; and she tended to communicate in negative ways to and with other members of the Police Department." (*Id.* at 10). It also noted that Plaintiff had previously been disciplined for the Facebook violation in April 2010 and the "late memorandum" incident in June 2011, and that it was "significant that just over three months after the [suspension for the June 2011 'late memorandum' incident], she again disobeyed the lawful orders of a superior officer." (*Id.* at 16).  The Board then terminated Plaintiff's position effective immediately. (*Id.* at 17).

**T.  The Instant Litigation, the Article 78 Proceeding, and the Second and Third Disciplinary Hearings**

On November 19, 2012, Plaintiff commenced this action by filing the Complaint. (Docket No. 1).  Plaintiff also challenged her termination in an Article 78 proceeding in the Supreme Court of the State of New York, County of Orange. (Nicaj Aff. Ex. 64).  By decision dated April 9, 2013, that court held that the City of Middletown had violated New York law by holding one of the seven days of proceedings in the First Disciplinary Hearing on a Sunday, and it annulled the Board's decision terminating Plaintiff. (*Id.*)  Plaintiff was thereafter "reinstated with back pay and benefits" and she is "currently suspended with pay." (Smith Aff. ¶ 3).

By notice dated April 16, 2014, Chief Bethencourt issued another set of disciplinary charges against Plaintiff for her: (i) conduct during the October 31, 2011 incident; and (ii) written request to receive overtime pay for two dates on which she was required to attend the First Disciplinary Hearing. (Nicaj Aff. Ex. 48).  The Second Disciplinary Hearing commenced with hearings held on April 25, 2014 and May 2, 2014, (Nicaj Aff. ¶ 66; *id.* Ex. 66), but ended

after one member of the Board resigned and the Board decided not to schedule any further hearing dates until a replacement was appointed, (Smith Reply Aff. ¶ 8).  The Third Disciplinary Hearing commenced on November 12, 2014, (Nicaj Aff. Ex. 67), and, as far as the Court is aware, is still ongoing.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure ("Federal Rules"), the moving party bears the burden of demonstrating that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986).  "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (citation omitted).  However, summary judgment—judgment as a matter of law—must be granted if the non-moving party fails to establish the existence of an essential element of the case and on which it bears the burden of proof at trial. *Celotex*, 477 U.S. at 322.

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products,*

*Inc.*, 530 U.S. 133, 150-51 (2000) (citations omitted).  However, the Court may not weigh the evidence or determine the truth of the matter. *Anderson*, 477 U.S. at 249.  Credibility determinations, the drawing of legitimate inferences from the facts, and evaluating ambiguous acts are functions of the jury, not the judge. *Reeves*, 530 U.S. at 150 (citation and quotation marks omitted); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001).

"Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (citations and quotation marks omitted).  Summary judgment should only be granted where "it is quite clear what the truth is." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010) (citation omitted).  However, a party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex*, 477 U.S. at 324; *see also Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1389 (2d Cir. 1992) ("when the evidence offered in opposition to [a motion or cross-motion for summary judgment] is defective in form but is sufficient to apprise the court that there is important and relevant information that could be proffered to defeat the motion, summary judgment ought not to be entered.") (citation omitted) (alteration in original).  Rather, "[m]aterials submitted in support of or in opposition to a motion for summary judgment 'must be admissible themselves or must contain evidence that will be presented in admissible form at trial.'" *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169-70 (2d Cir. 2014) (citations omitted).  A court may consider inadmissible documents if the opposing party does not timely object. *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("[U]ncertified or otherwise inadmissible documents may be considered by the court if not challenged. The objection must be timely or it will be deemed to have been waived.") (citation omitted) (alteration in original).

In the Southern District of New York, parties moving for and opposing summary judgment motions must also submit short and concise statements of facts, supported by evidence that would be admissible at trial. Local Rule 56.1. The opposing party must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Rule 56.1(c). Nonetheless, the Court has discretion "to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Holtz*, 258 F.3d at 73 (citations and quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(1)(B)(3).

## III. MOTIONS TO STRIKE

As an initial matter, the Court will consider Plaintiff's and Defendants' respective motions to strike a document submitted by the other side.

### A. Plaintiff's Motion to Strike

Plaintiff moves to strike the Smith Affidavit (*i.e.*, the affidavit submitted by counsel for Defendants), claiming that it is "littered with legal arguments." (Opp.[34] at 2). Rule 56(c)(4) of the Federal Rules states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Local Rule 7.1(a) states that motions "shall include . . . [s]upporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion." The Smith Affidavit properly sets out factual information and portions of the record in accordance with these rules. To the extent the Smith Affidavit contains any improper argument,

---

[34] Refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Sumary [sic] Judgment. (Docket No. 61).

its inclusion does not constitute a sufficient reason to strike the document. *See, e.g.*, *Brown v. Bd. of Trustees of Bldg. Serv. 32B-J Pension Fund*, 392 F. Supp. 2d 434, 446 (E.D.N.Y. 2005) ("courts have broad discretion in applying their local rules. . . . plaintiff's inclusion of argument in his affirmation and statement of material facts in dispute is not a sufficient reason to strike them."). Accordingly, Plaintiff's motion to strike is denied.

## B. Defendants' Motion to Strike

In return, Defendants contend that the Court should ignore Plaintiff's Rule 56.1 Response because it "contains a host of improper arguments as well as unsupported and conclusory allegations." (Reply[35] at 1). The Court construes this as a motion to strike Plaintiff's Rule 56.1 Response. "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz*, 258 F.3d at 74 (citation omitted). However, where, as here, the parties' Rule 56.1 statements have not sufficiently guided the Court, the Court may and has reviewed the record as a whole. *See id.* (citation omitted); Fed. R. Civ. P. 56(e). Therefore, the Court denies Defendants' motion to strike as moot.

## IV. DISCUSSION

I now turn to the merits of Defendants' motion for summary judgment. In her Complaint, Plaintiff alleges three different theories of liability under Title VII, Section 1983, and the NYHRL. First, she claims that Defendants' conduct created a gender-based hostile work environment. Second, she asserts that Defendants subjected her to adverse employment actions because of her gender. Third, she contends that Defendants retaliated against her for her

---

[35] Refers to Defendants' Reply Memorandum of Law in Support of Defendants' Motion Pursuant to FRCP Rule 56 for Summary Judgment Dismissing the Complaint. (Docket No. 70).

complaints of gender discrimination. (Opp. at 3; Complaint ¶¶ 72-81).  In the instant motion, Defendants move for summary judgment dismissing the Complaint in its entirety. (Motion at 1). Each theory of liability is analyzed below.

## A.  Hostile Work Environment under Title VII, Section 1983 and the NYHRL

Under her first theory of liability, Plaintiff alleges that Defendants "created and condoned an environment that, as a whole, was abusive, hostile, demeaning, and therefore altered the conditions of her employment due to her sex." (Opp. at 3-7).  Defendants argue that Plaintiff was not subjected to a hostile work environment because (i) the alleged harassment was not "severe or pervasive," (Motion at 13-17), and (ii) the alleged harassment was not gender-based, (*id.* at 17-18).

## i.  Legal Standard

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). "One form of gender discrimination prohibited by Title VII is sexual harassment that results in a 'hostile or abusive work environment.'" *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (citation omitted).  To establish a hostile work environment claim under Title VII, a plaintiff must show that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation omitted).  A "plaintiff must show both that the environment was objectively hostile and that the plaintiff subjectively perceived it to be hostile," *Raniola v. Bratton*, 243 F.3d 610, 620 (2d Cir. 2001) (citation omitted), and "must demonstrate either that a single incident

was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment," *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citations omitted).  The incidents "must be more than episodic." *Id.* (citation and quotation marks omitted).

The Court "must determine the existence of sexual harassment in light of the record as a whole and the totality of [the] circumstances." *Raniola*, 243 F.3d at 617 (citation omitted) (alteration in original).  Factors to be considered include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (citation omitted).  The Court may consider both reported and unreported instances of harassment. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) ("unreported incidents of harassment alleged by the plaintiff regarding the issue of hostile work environment . . . stand on the same footing as reported incidents; both must be taken as true at the summary judgment stage").  Additionally, the Court may consider acts committed against individuals besides the plaintiff. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ("a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.") (citation omitted) (*superseded by statute on other grounds as stated in Jones v. N.Y. State Metro D.D.S.O.*, 543 F. App'x 20 (2d Cir. 2013) (summary order)); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150-51 (2d Cir. 1997) ("[i]n a hostile workplace case, the trier of fact must examine the totality of the circumstances, including evidence of sexual harassment directed at employees other than the plaintiff") (citation omitted) (alteration in original).

In addition, "[i]t is axiomatic that to prevail on a claim of hostile work environment based on gender discrimination, the plaintiff must establish that the abuse was based on her gender." *Kaytor*, 609 F.3d at 547 (citations omitted).  The "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Raniola*, 243 F.3d at 617 (citation omitted).  However, abuse may be considered "based on gender" when an individual harasses a plaintiff in retaliation for the plaintiff's rejection of unwanted sexual advances. *See Fitzgerald v. Henderson*, 251 F.3d 345, 351, 361 (2d Cir. 2001) (holding that summary judgment was precluded on hostile work environment claim where plaintiff alleged that her supervisor "embarked on a campaign of harassment and abuse against complainant . . . in retaliation for her rejection of his unwanted sexual advances.") (citation omitted); *Lange v. Town of Monroe*, 213 F. Supp. 2d 411, 424 (S.D.N.Y. 2002) ("plaintiff sufficiently alleges that [defendant's] conduct towards her was motivated by her rejection of his sexual advances—an action arguably based on gender."), *abrogated on other grounds by Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015).

Finally, the plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Howley*, 217 F.3d at 154 (citations omitted).  When the alleged harasser is merely a co-worker, "an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013) (citation omitted).  However, if the alleged harasser is the plaintiff's supervisor, and the harassment "culminates in a tangible employment action, the employer is strictly liable." *Id.* at 2439.  If the "supervisor's harassment does not culminate in a tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an

affirmative defense." *Id.* at 2442.  "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* at 2454.  A "tangible employment action" consists of "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Neither a "bruised ego," nor a "demotion without change in pay, benefits, duties, or prestige" is sufficient. *Id.* (citations omitted).

**ii. Application**

Construing all reasonable inferences in Plaintiff's favor, the record shows that Plaintiff rejected Khalil's sexual advance in 2008 and he retaliated by creating an unpleasant work environment for Plaintiff after he was promoted to sergeant in 2010.  Over an approximately two-year period (from the time of Sergeant Khalil's 2010 promotion to the time Plaintiff was placed on administrative leave in April 2012), Plaintiff directly experienced about eight major issues with Sergeant Khalil: (1) the Facebook violation / "good morning" incident in or around April 2010; (2) the "arrest box" incident a few weeks later; (3) the "fingernail" incident on December 16, 2010; (4) the "clothes change" incident on December 27, 2010; (5) the "paperwork" incident on March 5, 2011; (6) the "taser" incident on March 10, 2011; (7) the "late memorandum" incident on June 10, 2011; and (8) the "wrong subsection" incident on October 31, 2011.  In addition to these incidents, Plaintiff alleges that her female co-workers experienced the following: (1) Sergeant Khalil directed Officer Sommer to say "good morning" to him; (2)

Officer Sommer came into the locker room "in tears crying [Sergeant Khalil] broke the Jew;"[36] and (3) on one occasion in or around February 2011, Sergeant Khalil advised some female officers that he was going to assign female officers to desk duty and male officers to patrol.

After reviewing the circumstances as a whole, I conclude that Plaintiff's hostile work environment claim cannot withstand summary judgment.[37]  First, Sergeant Khalil's alleged harassment was relatively infrequent.  Although Plaintiff argues that she "was subjected to hostile work environment based on her sex . . . virtually every time she worked with Khalil," (Opp. at 4), she also testified that she "was never regularly supervised by" Sergeant Khalil, and that she worked with Sergeant Khalil "[v]ery rarely" during 2010 and a total of "four or five times" after March 2011. (Plaintiff First Disc. Hr'g Tr. at 1499, 1534, 1542).  Second, Sergeant Khalil's alleged abuse was not particularly severe.  Plaintiff alleges that Sergeant Khalil became angry, spoke in a condescending tone, and yelled at her, and that his "hands and arms began to shake" on a few occasions, but she does not allege that he ever made any explicitly sexual comments, physically threatened her, or engaged in any other conduct that was "sufficiently continuous and concerted to have altered the conditions of her working environment." *Alfano*, 294 F.3d at 374 (citations and quotation marks omitted).

While Sergeant Khalil's conduct may have been unpleasant and upsetting, the incidents of which Plaintiff complains "were too few, too separate in time, and too mild, under the standard so far delineated by the case law, to create an abusive working environment." *Alfano*,

---

[36] Plaintiff has not cited to any evidence showing that Sergeant Khalil acted negatively towards Officer Sommer because of her gender.

[37] Plaintiff does not allege that any single incident in the record was so "extraordinarily severe" that it alone created a hostile work environment. *Alfano*, 294 F.3d at 374. Nor would the record support such an assertion. *Cf. Howley*, 217 F.3d at 148, 154 (finding that a single incident created a hostile work environment when the plaintiff's co-worker went on a lengthy, obscene tirade against the plaintiff in the presence of a large group of co-workers, including her subordinates).

31

294 F.3d at 380; *see also Danzy v. Chao*, 177 F. App'x. 133, 135 (2d Cir. 2006) (summary order) ("[Plaintiff] failed to make out a hostile work environment claim as the actions she alleged concerned only annoyances and personal disagreements and are therefore insufficient to show that her work environment 'was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered.'") (citation omitted); *Conklin v. Cty. of Suffolk*, 859 F. Supp. 2d 415, 426 (E.D.N.Y. 2012) ("While [Plaintiff] may have subjectively found the behavior to be harassing, that does not end the relevant inquiry because the conduct must be objectively hostile as well. There is no doubt that [Plaintiff's] employment situation may have been unpleasant, but this does not rise to the level of an illegal hostile environment."). Viewing the facts in the light most favorable to Plaintiff, although clearly unpleasant to Plaintiff, the complained-of conduct does not establish that the environment was objectively hostile, nor was it sufficiently severe or pervasive to create a hostile work environment.

Plaintiff's claims for hostile work environment under Section 1983 and the NYHRL fail under the same analysis. *See, e.g.*, *Demoret v. Zegarelli*, 451 F.3d 140, 153 (2d Cir. 2006) ("Because we have found as a matter of law that [defendants] did not subject plaintiffs to a hostile work environment [under Section 1983], defendants are entitled to summary judgment on plaintiffs' parallel state law causes of action."); *Smith v. Town of Hempstead Dept. of Sanitation Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) ("The standard for showing a hostile work environment under Title VII, . . . Section 1983 and the [NYHRL] is essentially the same.").[38]

---

[38] Plaintiff also noted that if Lieutenant Ewanciw had done a more thorough investigation in March 2011, he would have discovered that members of the Department referred to Plaintiff as "meatball" and that another female officer was nicknamed "camel toes." (Plaintiff's Rule 56.1 Counter-Statement ¶¶ 84-85). However, because Plaintiff does

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's claims for hostile work environment under Title VII, Section 1983 and the NYHRL.[39]

## B. Gender Discrimination under Title VII

Under her second theory of liability, Plaintiff alleges that Defendants discriminated against her on the basis of gender when they: (i) gave her a three-day suspension for turning in a late memorandum; and (ii) interrogated her, offered her a ten-day suspension and then brought disciplinary charges against her after she complained about Sergeant Khalil's discriminatory conduct during the October 31, 2011 incident. (Opp. at 12). Defendants counter that: (i) there is no evidence that any of Defendants' actions were gender-motivated, (Motion at 6-12); (ii) the "late memorandum" incident was "thoroughly investigated and documented as rank insubordination," (Reply at 9); and (iii) all of Plaintiff's claims arising out of the October 31, 2011 incident are moot because Plaintiff successfully challenged her termination in the Article 78 challenge, (Motion at 24).

### i. Legal Standard

Courts analyze Title VII gender discrimination claims under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination

---

not cite to (and the Court cannot locate) any statement in the record that Plaintiff was aware of these nicknames during her employment, any use of the nicknames cannot support Plaintiff's claim for hostile work environment. *See Raspardo v. Carlone*, 770 F.3d 97, 118 (2d Cir. 2014) (plaintiff could not use comments to support her hostile work environment claim where "she did not learn of any of these comments until after . . . [she] had resigned"); *P.F. v. Delta Air Lines, Inc.*, No. 99 CV 4127, 2000 WL 1034623, at *5 (E.D.N.Y. June 20, 2000) ("A plaintiff who did not know of the sexual acts directed at co-workers during the time in which she claims to have experienced a hostile work environment cannot assert them as a basis for believing her general work environment was so abusive as to effectively alter her working conditions.") (citation omitted).

[39] Because the Court decides that Plaintiff's claim fails on the grounds that Defendants' conduct was not sufficiently "severe or pervasive," the Court explicitly declines to consider: (1) Defendants' argument that Sergeant Khalil's alleged harassment was not based on Plaintiff's gender; and (2) whether "a specific basis exists for imputing the conduct that created the hostile environment to the employer," *Howley*, 217 F.3d at 154 (citations omitted).

by showing: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015); *see also Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (citation omitted).  The Second Circuit has "characterized the evidence necessary to satisfy this initial burden as 'minimal' and '*de minimis*.'" *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (citations omitted).

An "adverse employment action" is one that constitutes "a materially adverse change in terms and conditions of employment." *Syracuse*, 673 F.3d at 148 (citation omitted). "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citation omitted).  A plaintiff "does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).  However, an unpaid suspension is typically considered "adverse" in the Second Circuit regardless of the *Joseph* standard. *See Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 307 (N.D.N.Y. 2013) ("Numerous cases decided after *Joseph* have not applied the 'reasonable application of a preexisting disciplinary policy' standard to unpaid suspensions, which have been deemed *per se* adverse.") (collecting cases).  Moreover, even if a plaintiff's wages are later reimbursed, an unpaid suspension may constitute an "adverse employment action" if the plaintiff "at least suffered the loss of the use of her wages for a time." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001).

Plaintiff can raise an inference of discrimination for the purposes of making out a *prima facie* case by a "showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group.'" *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (citation omitted).  To show disparate treatment, a plaintiff must show that she was "similarly situated in all material respects" to her comparators. (*Id.*) (citation omitted).  As the Second Circuit has explained:

> What constitutes "all material respects" . . . varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. . . . Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (citations and quotation marks omitted); *see also Norville v. Staten Island University Hospital*, 196 F.3d 89, 96 (2d Cir. 1999) (to be "similarly situated," the comparators "must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's") (citation omitted).  The conduct in question does not have to be identical, but it must be of "comparable seriousness," *Berube v. Great Atl. & Pac. Tea Co.*, 348 F. App'x 684, 686 (2d Cir. 2009) (summary order) (citations omitted), and "sufficiently similar," *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).  "The determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated." *Graham*, 230 F.3d at 40.  This inquiry is very fact-specific.  Therefore, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* at 39 (citations omitted).  However, this rule is not absolute, and "a court can properly grant summary judgment where it is

clear that no reasonable jury could find the similarly situated prong met." *Harlen Associates v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citation omitted).

If a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendants to produce evidence that the adverse employment action was made "for a legitimate, nondiscriminatory reason." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "An employer's explanation of its legitimate nondiscriminatory reasons must be 'clear and specific.'" *Mandell*, 316 F.3d at 381 (citation omitted). However, "[a]ny stated reason is sufficient; the employer need not persuade the court that the proffered reason was the actual reason for its decision." *Tarshis v. Riese Org.*, 211 F.3d 30, 36 (2d Cir. 2000) (citations omitted), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Defendants' "burden is satisfied if the proffered evidence taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Ricci v. DeStefano*, 530 F.3d 88, 110 (2d Cir. 2008) (citations and quotation marks omitted).

If the employer carries its burden, the burden then shifts back to the plaintiff to come forward with evidence "that the proffered reason was not the true reason for the employment decision" but rather was a pretext for discrimination. *Burdine*, 450 U.S. at 256. To show pretext, a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) (citations omitted); *see also* 42 U.S.C. § 2000e-2 ("Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice."). This ultimate burden

may often be carried by reliance on the evidence comprising the prima facie case, without more. Thus, unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.

*Cronin*, 46 F.3d at 203 (citations omitted); *see also, e.g.*, *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("Ordinarily, plaintiff's evidence establishing a *prima facie* case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial.") (citations omitted).

## ii. Application

Defendants do not dispute that Plaintiff has established the first two elements of a *prima facie* case for Title VII gender discrimination—that Plaintiff (i) is a member of a protected class,[40] and (ii) was qualified for the position she held.  To the extent Defendants argue that Plaintiff has failed to establish element three (that Plaintiff suffered an "adverse employment action") because Plaintiff has been reinstated to her job with back pay and benefits, (Motion at 24), this claim fails, at minimum, because (i) Plaintiff was never paid back for her three-day unpaid suspension, and (ii) while Plaintiff was terminated she was unable to use her wages for a period of time. *See Lovejoy-Wilson*, 263 F.3d at 224.

Therefore, Plaintiff's *prima facie* case turns on whether she can establish element four— that the adverse employment actions occurred under circumstances giving rise to an inference of discriminatory intent.  To satisfy this element, Plaintiff identifies several male police officers at the Department whom she claims engaged in misconduct that was comparable to or greater than

---

[40] It is axiomatic that women are a protected class under Title VII. *See, e.g.*, *Schappert v. Bedford, Freeman & Worth Pub. Grp., LLC*, No. 03 Civ. 0058 (RMB), 2004 WL 1661073, at *6 (S.D.N.Y. July 23, 2004).

hers and yet received favorable treatment. (Opp. at 23-28; Plaintiff's Rule 56.1 Counter-Statement ¶¶ 241-276). Defendants argue that the male officers are not "similarly situated in all material respects" to Plaintiff and, therefore, Plaintiff's comparisons do not raise any inference of discrimination. (Reply at 11-12; Smith Reply Aff. ¶ 52; Bethencourt Reply Aff. ¶¶ 4-7). As an initial matter, it appears that, as police officers, Plaintiff and her comparators were all "subject to the same workplace standards." *Graham*, 230 F.3d at 40. The Court now turns to evaluate whether, construing all reasonable inferences in the non-moving Plaintiff's favor, the comparators are "similarly situated" and raise an inference of discrimination.

First, a reasonable juror could conclude that Comparator One was a similarly situated male who was treated differently than Plaintiff. On March 4 or 5, 2011 (the same night as the "paperwork" incident), Comparator One cursed at Sergeant Khalil, stating: "I am going to ask you to leave me the fuck alone" and "[w]hen you treat me like a man, I will start acting like a man." (Ewanciw Second Disc. Hr'g Tr. at 612-13; Khalil Dep. at 135). Sergeant Khalil did not request discipline for Comparator One's insubordination. (Khalil Dep. at 135).

Defendants argue that Comparator One is not "similarly situated" to Plaintiff because (i) Sergeant Khalil testified that Comparator One's level of insubordination "was not even remotely close" to Plaintiff's, (Smith Reply Aff. ¶ 52; Khalil Dep. at 133), and (ii) Lieutenant Ewanciw did not investigate the incident because Sergeant Khalil had notes saying that he had addressed the situation, and Lieutenant Ewanciw "was satisfied with that," (Smith Reply Aff. ¶ 52; Ewanciw Dep. at 285). However, a reasonable juror could find that Comparator One's level of insubordination—cursing at Sergeant Khalil—was similar to or greater than Plaintiff's level of insubordination—failing to obey Sergeant Khalil's order to finish a memorandum before her shift ended—and yet Plaintiff received an unpaid suspension for her insubordination while

Comparator One received no discipline at all.  Accordingly, a reasonable juror could conclude that Plaintiff and Comparator One were similarly situated, yet treated differently.

Second, a reasonable juror could also conclude that Comparator Two was a similarly situated male who was treated differently than Plaintiff.  On July 27, 2010, Comparator Two and another officer had a disagreement about who had to respond to more dispatch calls. (Nicaj Aff. Ex. 119).  Sergeant Jeffry Thoelen ("Sergeant Thoelen") told Dispatcher Bane to dispatch the next call to Comparator Two. (*Id.*).  Comparator Two then said in an angry tone "I can hear you," walked towards Sergeant Thoelen saying "[t]his is fucking bullshit, [f]ucking suspend me," and slammed his handgun and badge onto Sergeant Thoelen's desk. (*Id.*).  Comparator Two was placed on modified duty while the Department investigated this incident and, by disposition dated September 20, 2010, Comparator Two agreed to a ten-day unpaid suspension and a six-month probation period. (*Id.*).  On October 17, 2010 (less than one month after he was placed on probation), Comparator Two "knowing[ly] violate[d] . . . the direct order of a Supervisor in which he was ordered to remain on patrol within the boundaries of the City of Middletown and not engage in a pursuit which had begun." (Nicaj Aff. Ex. 120).  By disposition dated November 2, 2010, Comparator Two agreed to a one-day suspension (to be served as a loss of eight hours of personal time) for this second violation. (*Id.*).

In arguing that Comparator Two is not an appropriate comparator, Defendants assert that Comparator Two was actually "treated more harshly" than Plaintiff because "this was his first act of discipline" in the Department. (Bethencourt Reply Aff. ¶ 4).  It appears that Comparator Two's discipline for his first act of insubordination was harsher than Plaintiff's discipline for her first act of insubordination (*i.e.* he received a ten-day unpaid suspension plus a six-month probation period and she received a three-day unpaid suspension).  However, his discipline for

his second act of insubordination was not as harsh as Plaintiff's discipline for her second act of

insubordination (*i.e.* he received a one-day suspension and she received an offer for a ten-day

suspension and was ultimately terminated).  Thus, a reasonable juror could conclude that

Plaintiff and Comparator Two were similarly situated, yet treated differently.

A similar analysis applies to Comparator Three.  On December 4, 2012, Lieutenant Booth

ordered Comparator Three to go out on patrol and Comparator Three turned his body, began

typing on a computer, and responded that he was "sending an email to a Lieutenant." (Nicaj Aff.

Ex. 121).  Lieutenant Metakes investigated this incident and found that Comparator Three had

violated Department policy regarding rules of conduct, reporting for duty, and insubordination,

but he did not recommend any specific sanction. (*Id.*).  On January 19, 2013, Comparator Three

called Sergeant Tobin at a victim's request while Comparator Three was handling a menacing

complaint. (*Id.* Ex. 122).  Lieutenant Ewanciw reviewed a recording of the call and wrote in a

memorandum that Comparator Three was "insubordinate and disrespectful" and that he believed

that Comparator Three "intentionally hung up" on Sergeant Tobin. (*Id.*).  Lieutenant Schuh noted

that this was not an "isolated incident." (*Id.*).  By disposition dated March 8, 2013, Comparator

Three agreed to a one-day unpaid suspension (to be served as a loss of personal time) for this

violation. (*Id.*).

Defendants state that Comparator Three is not "similarly situated" to Plaintiff because: (i)

he had had no previous discipline; (ii) he had been shot in the line of duty and Defendants

"believed he was suffering from post traumatic stress disorder ['PTSD'] from the shooting;" and

(iii) his first discipline was "slightly harsher" than Plaintiff's first discipline. (Bethencourt Reply

Aff. ¶ 5).  Although these may be appropriate reasons for different penalties, both Plaintiff and

Comparator Three were police officers, subject to the same performance evaluations, guidelines

and discipline, and yet they received different penalties for insubordination.  Drawing all reasonable inferences in favor of Plaintiff, a reasonable juror could also find that Plaintiff and Comparator Three were similarly situated and yet treated differently when she received a three-day unpaid suspension the first time she was formally disciplined for insubordination while Comparator Three received only a one-day unpaid suspension the first time he was formally disciplined for insubordination. (Nicaj Aff. Exs. 7, 122).

Fourth, Plaintiff asserts that Comparator Four is similarly situated.  On March 5, 2013, Comparator Four was suspended for two days for violations related to vehicle operations. (Nicaj Aff. Ex. 127).  On December 14, 2013, Comparator Four was dispatched to a domestic dispute involving a person who may have been in possession of a gun. (*Id.* Ex. 123).  When he returned to the precinct, Sergeant Tobin suspected that Comparator Four had consumed alcohol. (*Id.*).  Comparator Four eventually submitted to a field breath test, which indicated that his blood alcohol level was .191%. (*Id.*).  Comparator Four agreed to the following penalties: completion of an in-patient treatment program for alcohol abuse; a ten-day unpaid suspension; and a twenty-day suspension to be served as a loss of accrued time. (*Id.*).

Defendants argue that Comparator Four is not "similarly situated" to Plaintiff. (Bethencourt Reply Aff. ¶ 6).  The circumstances of Plaintiff's and Comparator Four's cases are very different.  While it is not necessary for the employees to "engage in the exact same offense," these offenses are not of "comparable seriousness" or "sufficiently similar;" thus, Comparator Four is not an appropriate comparator.  Although the question of whether two employees are similarly situated is a question of fact ordinarily left to the jury, "to be considered similarly situated, 'their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Trotman v. CBS Radio Inc.*, No. 06 CIV. 3389

41

(FM), 2007 WL 2827803, at *9 (S.D.N.Y. Sept. 27, 2007) (citation omitted). Since Plaintiff and Comparator Four were not similarly situated in all material respects and "there are many distinguishing factors between plaintiff and the comparator[], the court may conclude as a matter of law that they are not similarly situated." *Shaw v. McHugh*, No. 12-CV-6834 (CS), 2015 WL 1400069, at *10 (S.D.N.Y. Mar. 26, 2015) (citation omitted), *aff'd*, No. 15-1349, 2016 WL 929386 (2d Cir. Mar. 11, 2016).

On the basis of these three comparators,[41] Plaintiff has raised a genuine issue of material fact as to whether she was treated less favorably than similarly-situated male officers. She has therefore established a *prima facie* case of gender discrimination under Title VII.

Defendants argue that "the record demonstrates that Defendants all had 'legitimate, nondiscriminatory reasons'" for the disciplinary actions taken against Plaintiff, and they cite to *Eldaghar v. City of New York Dept. of Citywide Admin. Servs.*, No. 02 Civ. 09151(SC)(HBP), 2008 WL 4866042, at *10 (S.D.N.Y. Nov. 7, 2008), for the proposition that "Plaintiff's job performance is a legitimate, nondiscriminatory reason for [an employer's] decision to terminate Plaintiff." (Motion at 8). The record is clear that Plaintiff violated certain Department regulations. (*See, e.g.*, Smith Aff. Exs. 2, 32; Nicaj Aff. Ex. 27). Assuming *arguendo* that Defendants have met their minimal burden here, it is nonetheless clear that Defendants have not provided a "dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject." *Cronin*, 46 F.3d at 203. A reasonable juror could conclude that the conduct for which Plaintiff was disciplined was not egregious enough to merit the discipline imposed. Given the Board's written recognition in its decision to terminate Plaintiff

---

[41] Plaintiff also cites evidence regarding three additional comparators. (Plaintiff's Rule 56.1 Counter-Statement ¶¶ 271-276). Based on the information provided, these additional comparators were not disciplined for insubordination and, thus, are not similarly situated.

that Plaintiff's performance evaluations "generally have been positive," (Smith Aff. Ex. 32 at 10), and the evidence from Plaintiff's *prima facie* case that similarly-situated males were treated more favorably than she was, Plaintiff has sufficiently raised "a question of fact to be resolved by the factfinder after trial," *Cronin*, 46 F.3d at 203.

Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's claim of gender discrimination under Title VII.

## C. Gender Discrimination under Section 1983

In addition to her Title VII claims against the City of Middletown, Plaintiff also asserts a claim against all Defendants pursuant to Section 1983 for an alleged violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (Complaint ¶ 73). Defendants assert generally that they cannot be held liable because Plaintiff has not shown that they acted with any discriminatory intent. (Motion at 6-12; Reply at 13).

Section 1983, in relevant part, allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of . . . the Equal Protection Clause." *Patterson*, 375 F.3d at 225. However, there are differences between Title VII and Section 1983—namely in establishing municipal and individual liability—that are relevant here.

### i. Individual Liability

First, the Court will address Plaintiff's Section 1983 claim for gender discrimination against the individual Defendants. "In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (citation omitted). In addition, "liability for an Equal Protection Clause violation under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose." *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012) (citation omitted). In other words, a plaintiff must demonstrate "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009); *see also Raspardo*, 770 F.3d at 125 ("Individual liability under § 1983 for disparate treatment requires us to examine each individual defendant's actions to determine whether he treated the plaintiffs disparately on the basis of sex.") (citation omitted). A defendant's "personal involvement"

> can be established by showing that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015). "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. . . . It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Reynolds*, 685 F.3d at 204 (quoting *Iqbal*, 556 U.S. at 676-77) (alteration in original) (quotation marks omitted). However, a defendant's

"discriminatory purpose" must often "be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted).  In addition, the Second Circuit has noted that "questions of subjective intent can rarely be decided by summary judgment." *United States v. City of New York*, 717 F.3d 72, 82 (2d Cir. 2013) (citation omitted); *accord Mandell*, 316 F.3d at 377 ("In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'") (citation omitted).  However, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

Here, Plaintiff has met two threshold requirements as to all of the individual Defendants. First, a reasonable juror could conclude that the individual Defendants were "acting under color of state law" at all relevant times. *See, e.g.*, *Back*, 365 F.3d at 123 (2d Cir. 2004) ("[S]tate employment is generally sufficient to render the defendant a state actor.") (citation omitted) (alteration in original); *Carmichael v. City of New York*, 34 F. Supp. 3d 252, 260 (E.D.N.Y. 2014) ("Because there is no dispute that the actions or inactions at the heart of this case are attributable to state actors, *i.e.,* officers of the NYPD, the state action element is satisfied."), *appeal dismissed* (Dec. 22, 2014); *Kelly v. Marchiano*, 332 F. Supp. 2d 687, 688, 690 (S.D.N.Y. 2004) (referring to a lieutenant, a chief of police, and a "duly elected member[] of the Town Board" as "state actors").  Second, Plaintiff's claim that she was "deprived of a federal right" is sufficient to survive summary judgment for the same reasons her Title VII gender discrimination claims survived summary judgment. *See* Section IV(B), *supra*; *Back*, 365 F.3d at 117 ("Individuals have a clear right, protected by the Fourteenth Amendment, to be free from

discrimination on the basis of sex in public employment.") (citations omitted).  Therefore,
Plaintiff's Section 1983 claims against the individual Defendants turn on whether she can
demonstrate that each individual was "personally involved" and acted with "discriminatory
purpose" in depriving her of her federal right to be free from gender-based employment
discrimination.

    The record is devoid of any evidence, circumstantial or otherwise, that the Board
members (Mayor DeStefano, Commissioner Cummings, Commissioner Vignola, Commissioner
McCarey and Commissioner Green[42]), acted with any discriminatory purpose in terminating
Plaintiff.  Plaintiff has not submitted any evidence, for example, that the Board imposed lesser
penalties on similarly-situated male police officers *who were subject to disciplinary hearings*.  In
the First Disciplinary Hearing, the Board heard seven days of testimony from ten witnesses
(including Plaintiff) and reviewed dozens of evidentiary documents. (Smith Aff. Ex. 32 at 3-7).
Although the Board ultimately decided that Plaintiff's allegations regarding Sergeant Khalil's
alleged 2008 sexual advance were "not credible," and although they apparently credited
testimony from Sergeant Khalil and other members of the Department in deciding to terminate
Plaintiff, these facts are not sufficient to establish that the Board members *themselves*
individually intended to discriminate against Plaintiff on the basis of gender. *See, e.g.*, *Back*, 365
F.3d at 127 (affirming summary judgment dismissing Section 1983 claim against defendant
superintendent who recommended to the Board of Education that plaintiff be denied tenure;
although he investigated plaintiff's claims of gender discrimination and found them meritless,
there was "no indication that . . . his investigation [was] undertaken with a jaundiced eye."); *see*

---

[42] Commissioner Green attended one day of the First Disciplinary Hearing but did not participate in the deliberations
or the decision to terminate Plaintiff. (Green Dep. at 48-49).

*also, e.g.*, *Volpe v. Nassau Cty.*, 915 F. Supp. 2d 284, 299 (E.D.N.Y. 2013) ("The complaint is devoid of . . . any reference to [defendant's] alleged discriminatory intent."). Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's Section 1983 claims for gender discrimination against Mayor DeStefano, Commissioner Cummings, Commissioner Vignola, Commissioner McCarey, and Commissioner Green.

The record similarly does not support the inference that Chief Bethencourt, Lieutenant Metakes or Lieutenant Ewanciw intentionally discriminated against Plaintiff on the basis of gender. Construing all reasonable inferences in Plaintiff's favor, the record shows that Plaintiff disclosed the 2008 sexual advance to all three men and complained that Sergeant Khalil was harassing her. (Plaintiff Dep. at 29-36). In other words, the record shows that all three men were on notice that Sergeant Khalil may have been treating Plaintiff more harshly than other individuals on account of her gender. However, these allegations are not sufficient to establish that Chief Bethencourt, Lieutenant Metakes and Lieutenant Ewanciw *themselves* were acting with discriminatory intent. *See Iqbal*, 556 U.S. at 677 (rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution."). The record also shows that Sergeant Khalil and Chief Bethencourt were friends at all relevant times and purchased two properties together, (Plaintiff's Rule 56.1 Counter-Statement ¶¶ 20-22), and that Sergeant Khalil and Lieutenant Ewanciw engaged in real estate transactions together, (*id.* ¶ 23). Based on these allegations, a reasonable juror could conclude that Chief Bethencourt and Lieutenant Ewanciw were influenced by their personal connections to Sergeant Khalil and therefore treated Plaintiff more harshly than they treated other employees. This, however, does not establish that Chief Bethencourt and Lieutenant Ewanciw intentionally discriminated against Plaintiff *on the basis of gender*. *See, e.g.*, *Lange*,

47

213 F. Supp. 2d at 424 ("Although the Board members may have been influenced by their personal and political connections to [defendant], this is insufficient to establish a constitutional violation" where there is "no basis from which to infer that the Board's conduct was directed against [plaintiff] on the basis of gender"). Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's Section 1983 claims for gender discrimination against Chief Bethencourt, Lieutenant Metakes and Lieutenant Ewanciw.

However, the Court does find sufficient evidence to support the inference that Sergeant Khalil intentionally discriminated against Plaintiff on the basis of gender. Construing all reasonable inferences in Plaintiff's favor, the record shows that Sergeant Khalil disciplined Plaintiff more harshly than he disciplined male officers. In particular, as noted in Section IV(B)(ii), *supra*, Sergeant Khalil asked that Plaintiff be disciplined for her acts of insubordination, (Smith Aff. Ex. 5 at 6), but did not request that Comparator One be disciplined when he cursed at Sergeant Khalil, stating: "I am going to ask you to leave me the fuck alone" and "[w]hen you treat me like a man, I will start acting like a man." (Ewanciw Second Disc. Hr'g Tr. at 612-13; Khalil Dep. at 135). This disparate treatment, combined with Plaintiff's allegation that Sergeant Khalil treated her more harshly than other police officers because she rejected his sexual advance in 2008, is sufficient to raise an inference that Sergeant Khalil discriminated against Plaintiff on the basis of gender. *See, e.g.*, *Mandell*, 316 F.3d at 379 (noting that showing "disparate treatment" is one way of "raising an inference of discrimination"); *Lange*, 213 F. Supp. 2d at 424 (noting that conduct "motivated by [plaintiff's] rejection of [defendant's] sexual advances" was "arguably based on gender"). Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's Section 1983 claims for gender discrimination against Sergeant Khalil.

### ii. Municipal Liability

Second, the Court will address Plaintiff's Section 1983 claim for gender discrimination against the City of Middletown. A municipality such as the City of Middletown "cannot be held liable under § 1983 on a *respondeat superior* theory"—*i.e.*, it cannot be held liable "*solely* because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (emphasis in original). Rather, a plaintiff must show that "the challenged acts were performed pursuant to a municipal policy or custom." *Patterson*, 375 F.3d at 226 (citing *Monell*). To establish the existence of a "policy or custom," a plaintiff may demonstrate:

> (1) the existence of a formal policy officially promulgated or adopted by the municipality, (2) actions or decisions by an official with final policymaking authority which caused the alleged violations of constitutional rights, (3) the existence of a custom or practice so permanent, persistent, and widespread on the part of subordinate officials such that it constitutes a custom or usage so as to imply the constructive acquiescence of policymaking officials, or (4) the failure of policymaking officials to properly train or supervise their subordinates, amounting to a deliberate indifference to the rights of those encountering municipal employees.

*Lawrence v. City of Rochester*, No. 09-CV-6078-FPG, 2015 WL 510048, at *6 (W.D.N.Y. Feb. 6, 2015) (citations omitted); *see also, e.g.*, *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions—either expressly or tacitly. Thus, a plaintiff can prevail against a municipality by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them.") (citations omitted).

Here, Defendants have not briefed the issue of municipal liability under Section 1983 and therefore have not met their "initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of [the record] which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also, e.g.*, *Kaye v.*

*Grossman*, No. 97 CIV. 8679 (JSR), 1999 WL 33465, at *2 (S.D.N.Y. Jan. 27, 1999) ("As to fraud, summary judgment must be denied because, as [defendant's] counsel conceded at oral argument, her moving papers are utterly devoid of any argument in support of dismissal.") (citing *Celotex*).  Therefore, the Court denies summary judgment as to Plaintiff's Section 1983 claims for gender discrimination against the City of Middletown.

## D. Gender Discrimination under the NYHRL

Plaintiff also asserts a claim against all Defendants for gender discrimination pursuant to the NYHRL. (Complaint ¶ 79).  Defendants argue generally that they should not be held liable because Plaintiff has failed to adduce any evidence that they acted with discriminatory intent. (Motion at 6-12).

The Court denies Defendants' motion for summary judgment as to Plaintiff's NYHRL claim against the City of Middletown under the analysis outlined in Section IV(B), *supra*. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n. 10 (2d Cir. 2011) (in general, discrimination "claims brought under [the NYHRL] are analytically identical to claims brought under Title VII.") (citation omitted); *Villar v. City of New York*, No. 09-CV-7400 (DAB), 2015 WL 5707125, at *8 (S.D.N.Y. Sept. 29, 2015) ("Courts in this Circuit analyze Title VII and [NYHRL] claims of employment discrimination according to the [same framework]") (citation omitted).

The NYHRL also provides for individual liability under two provisions.  First, the NYHRL provides, in relevant part, that "[it] shall be an unlawful discriminatory practice: . . . (a) [f]or an employer . . . because of an individual's . . . sex . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).  An "employer" under this provision is

50

someone who has "ownership interests in the [employer] or do[es] more than carry out personnel decisions of others." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 53 (2d Cir. 2014) (citation omitted) (first alteration in original, second alteration added).  It is clear that none of the individual Defendants can be considered "employers" under this provision.  First, they could not have an ownership interest in this government entity.  Second, although the City of Middletown Charter establishes that the Board has the collective authority to dismiss police officers, (City of Middletown Charter § 129), Plaintiff has not alleged that any of the individual Board members had the power to hire or fire personnel on their own. *See Stevens v. New York*, 691 F. Supp. 2d 392, 401 (S.D.N.Y. 2009) (finding that individual defendants without the power to hire or fire cannot be considered employers under the NYHRL).  Plaintiff has similarly failed to allege that Chief Bethencourt, Lieutenant Metakes, Lieutenant Ewanciw or Sergeant Khalil has this authority under the City of Middletown Charter. (City of Middletown Charter §§ 130, 131).  Therefore, the individual Defendants cannot be found liable as "employers" under the NYHRL.

Second, the NYHRL makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6).  Individuals may be held liable as "aiders and abetters" under this provision if they "actually participate[] in the conduct giving rise to a discrimination claim." *Rojas*, 660 F.3d at 107 n. 10 (citation omitted).  To "actually participate" in discriminatory conduct, "an individual need not himself take part in the primary violation. . . . An individual in a supervisory role may also be held liable for a failure to take appropriate investigative or remedial measures upon being informed of offensive conduct." *Makinen*, 2016 WL 880194, at *6 (citation omitted).  A plaintiff must also show that the aider and abettor acted with discriminatory intent. *See Hassan v. City of Ithaca, N.Y.*, No. 10-CV-06125, 2012 WL 1190649, at *6 (W.D.N.Y. Apr. 9, 2012)

("The aider and abettor must also 'share the intent or purpose of the principal actor' and the

plaintiff must show the 'direct [and] purposeful [ ] participation' of the aider and abettor to

establish liability under § 296(6).") (citation omitted) (alterations in original); *Lewis v.*

*Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 381 (S.D.N.Y. 1999) (citation omitted)

("if the plaintiff fails to plead any facts suggesting that a defendant displayed any intent to

discriminate or was in any way involved in the alleged discriminatory scheme, the defendant

may not be held liable" under this provision).  In addition,

> it is well settled that an individual employee can 'aid and abet' his own conduct in
> violation of the [NYHRL], in the sense that a defendant can be held liable for aiding
> and abetting his employer's creation of a hostile work environment even where his
> conduct alone serves as the predicate for the employer's vicarious liability.

*Johnson v. Cty. of Nassau*, 82 F. Supp. 3d 533, 535 (E.D.N.Y. 2015).

Here, the individual Board members, Chief Bethencourt, Lieutenant Metakes and

Lieutenant Ewanciw cannot be considered "aiders and abettors" under the NYHRL because, as

outlined in Section IV(C)(i), *supra*, the record does not support an inference that these

individuals acted with discriminatory intent against Plaintiff on the basis of gender.  On the other

hand, the Court has found sufficient evidence to support an inference that Sergeant Khalil

intentionally discriminated against Plaintiff on the basis of gender. *See* Section IV(C)(i), *supra*.

The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's NYHRL

claim against Mayor DeStefano, Commissioner Cummings, Commissioner Vignola,

Commissioner McCarey, Commissioner Green, Chief Bethencourt, Lieutenant Metakes and

Lieutenant Ewanciw and denies Defendants' motion for summary judgment as to Plaintiff's

NYHRL claim against Sergeant Khalil.

## E. Retaliation under Title VII

Under her third theory of liability, Plaintiff alleges that Defendants retaliated against her for opposing gender discrimination in the workplace when they: (i) gave her a three-day suspension for turning in a late memorandum after she submitted a formal complaint against Sergeant Khalil in March 2011; (ii) interrogated her and offered her a ten-day suspension after she complained about Sergeant Khalil's conduct during the October 31, 2011 incident; and (iii) brought disciplinary charges against her and then terminated her after her attorney sent a letter dated April 17, 2012 stating that she intended to file the EEOC Charge. (Opp. at 10-12). Defendants counter that: (i) Plaintiff did not participate in an activity protected under Title VII, (Motion at 19-23); and (ii) there is no proof that the disciplinary charges issued against Plaintiff were pretextual, (*id.* at 23-24).

## i. Legal Standard

Title VII includes an anti-retaliation provision that makes it unlawful "for an employer to discriminate against any . . . employee[] . . . because [that individual] has opposed any practice" made unlawful by Title VII or "has made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding. 42 U.S.C. § 2000e–3(a). Like Title VII discrimination claims, these retaliation claims are reviewed under "the familiar burden-shifting approach" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Kaytor*, 609 F.3d at 552. To establish a *prima facie* case of retaliation under Title VII, a plaintiff

> must show (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Kaytor*, 609 F.3d at 552. The Second Circuit has characterized the plaintiff's burden of proof as to this step as "minimal" and "*de minimis*," *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844

(2d Cir. 2013) (citation omitted), and has noted that "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted).  "At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action." *Kaytor*, 609 F.3d at 552-53 (citation omitted).  If the employer does so, a plaintiff must show "that retaliation was a but-for cause of an adverse employment action." *Zann Kwan*, 737 F.3d at 846.  One way to establish but-for causation is to demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's" explanation for its actions. *Id.*  Showing "but-for" causation requires proof "that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.*

The term "protected activity" in the first element of a *prima facie* case "refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz*, 202 F.3d at 566. Protected activities include "the filing of formal charges of discrimination as well as . . . the making of informal protests of discrimination." *Summa v. Hofstra Univ.*, 708 F.3d 115, 126-27 (2d Cir. 2013) (citation omitted).  A plaintiff "need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Id.* at 126.  A plaintiff's "subjective good faith belief is insufficient[;] the belief must be reasonable and characterized by *objective* good faith." *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 16-17 (2d Cir. 2013) (citation omitted) (alteration and emphasis in original).

As to the second element of a *prima facie* case, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Kelly*, 716 F.3d at 15.  A plaintiff need not demonstrate that "the agents who carried out the adverse action" were aware of her complaint; instead, she must merely show "general corporate knowledge that the plaintiff has engaged in a protected activity." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) (citations omitted).

The term "materially adverse employment action" in the third element of a *prima facie* case means an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations and quotation marks omitted); *accord Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014).  This term is defined more broadly in the Title VII retaliation context than in the Title VII discrimination context. *See Hicks*, 593 F.3d at 165 ("it is now clear that Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'") (citation omitted); *Fenn v. Verizon Commc'ns, Inc.*, No. 08 Civ. 2348(PGG), 2010 WL 908918, at *11 (S.D.N.Y. Mar. 15, 2010) ("The anti-retaliation provision of Title VII is not limited to discriminatory actions that alter or 'affect the terms and conditions of employment.'") (citations omitted).

As to the fourth element of a *prima facie* case, "[p]roof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus

directed against a plaintiff by the defendant." *Cook v. CBS, Inc.*, 47 F. App'x 594, 596 (2d Cir. 2002) (summary order) (emphasis in original); *see also Kaytor*, 609 F.3d at 552 ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action.").

**ii. Application**

Here, Plaintiff claims that she first engaged in "protected activity" when she lodged a formal complaint against Sergeant Khalil in March 2011. (Opp. at 10, 12). As part of her complaint, Plaintiff submitted a memorandum documenting "some of her negative encounters" with Sergeant Khalil. (Nicaj Aff. Ex. 3). Over the course of a six-page single-spaced memorandum, the only mention of gender is Plaintiff's statement that Sergeant Welch told her that everyone, "even male officers," had trouble unloading the last two rounds of their shotguns. (Nicaj Aff. Ex. 30). This memorandum, standing alone, does not constitute "protected activity" because a reasonable juror could not find that Plaintiff wrote it to "protest or oppose *statutorily prohibited discrimination*"—*i.e.*, discrimination on the basis of gender. *Cruz*, 202 F.3d at 566 (emphasis added). *See, e.g.*, *Kelly*, 716 F.3d at 15 ("[P]laintiff's allegations that her supervisor 'berated' her and made other harsh comments . . . amount only to general allegations of mistreatment, and do not support an inference that plaintiff had a reasonable good faith belief that she was subject to gender discrimination.") (citation omitted) (alteration in original); *Foster v. Humane Soc'y of Rochester & Monroe Cnty., Inc.*, 724 F. Supp.2d 382, 395 (W.D.N.Y. 2010) ("Her own allegations, and the documents she relies on, show instead that while she did complain about certain problems she was having at work, she did not complain that she was being discriminated against on account of her sex."); *Brown v. City of New York*, No. 11 Civ.

2915 (PAE), 2013 WL 3789091, at *15 (S.D.N.Y. July 19, 2013) (memorandum that contained

"at best glancing references" to gender did not constitute "protected activity").

However, reasonable jurors could disagree about whether Plaintiff's *verbal* complaints in

March 2011 constituted "protected activity."  First, after Plaintiff spoke to Lieutenant Schuh, he

wrote a memorandum documenting their conversation that included the following paragraph:

> She stated that she believes [Sergeant Khalil] has also picked on PO Sommer.  She
> stated that she has observed PO Sommer "balling" in the locker room because of
> Sgt. Khalil.  Further, PO Sommer told her that she overheard Sgt. Khalil tell
> someone (unknown who) that he wanted to put the women on the desk so that only
> the men would be on the road for the summer.

(Smith Aff. Ex. 4; *see also* Plaintiff Dep. at 63-64).  A reasonable juror could conclude from this

paragraph that Plaintiff told Lieutenant Schuh that Sergeant Khalil (i) also singled out another

female police officer for harsh treatment, and (ii) discriminated against female police officers in

the distribution of work assignments. *See, e.g.*, *Drumm v. Suny Geneseo Coll.*, 486 F. App'x 912,

914 n.3 (2d Cir. 2012) (summary order) ("An allegation that, for example, her supervisor

directed harsh comments only at female employees might have provided a good faith basis for

plaintiff's complaint of gender discrimination").  Second, Plaintiff testified that she disclosed

during an interview with Chief Bethencourt and Lieutenant Ewanciw in March 2011 that

Sergeant Khalil made a sexual advance, in response to Lieutenant Ewanciw's questioning about

"what created" the issues between her and Sergeant Khalil. (Plaintiff Dep. at 29-36).  A

reasonable juror could also find that, through this statement, Plaintiff suggested to Lieutenant

Ewanciw and Chief Bethencourt that Sergeant Khalil was discriminating against her on the basis

of gender. *See, e.g., Kelly*, 716 F.3d at 17 ("Had [plaintiff] complained, *or even suggested*, that

she was being discriminated against because of her sex, . . . we would have a different case.")

(emphasis added).

The Court notes that it is not at all clear that Plaintiff "possessed a good faith, reasonable belief" *in March 2011* that Sergeant Khalil's treatment against her constituted gender discrimination. *Summa*, 708 F.3d at 126.  In particular, when questioned in her deposition as to whether she had ever submitted a written complaint of gender discrimination prior to April 2012, Plaintiff testified that

> the last paragraph of [her memorandum regarding the October 2011 incident] puts in how I was harassed. But I don't think it contributed, it didn't contribute to it, take that back, that it was specifically off of my gender. *But coming to later on I believe that it is*, but it wasn't documented in that memo, but it was documented that I was being discriminated against. So half yes half no.

(Plaintiff Dep. at 75) (emphasis added).  Some may read this statement as an admission that, in March 2011, Plaintiff did not believe that Sergeant Khalil was discriminating against her on the basis of gender.  However, Plaintiff's statement is not clear enough for this Court to decide, as a matter of law, that Plaintiff did not have such a "good faith, reasonable belief."  Therefore, the Court finds that Plaintiff has made a sufficient showing that she engaged in "protected activity" in March 2011.

As to the second element, Defendants do not dispute that they were aware of Plaintiff's March 2011 complaint.  They do argue, however, that they could not reasonably have understood Plaintiff's complaint as one of *gender* discrimination because Plaintiff told Lieutenant Ewanciw that she "didn't want to make a big deal about" the 2008 sexual advance and did not "want to make this into a girl thing . . . [or] a female thing." (Motion at 22-23; Plaintiff Dep. at 34-36). The Court disagrees.  A reasonable juror could conclude that Plaintiff was raising a complaint of gender discrimination while at the same time expressing concern about the repercussions of being "labeled . . . as that type of person that . . . waived the flag," (Plaintiff Dep. at 35), and a

reasonable employer could come to the same conclusion.  Therefore Plaintiff has sufficiently demonstrated that her employer was "aware" that she engaged in protected activity.

Plaintiff has also sufficiently established elements three and four of her *prima facie* case—that she was subject to a "materially adverse employment action" and that "there was a causal connection between the protected activity and the adverse employment action." *Kaytor*, 609 F.3d at 552.  In a memorandum dated March 12, 2011 (four days after Plaintiff formally complained about him), Sergeant Khalil stated that Plaintiff had violated Department regulations and requested that "a formal investigation be conducted" regarding several incidents he had had with Plaintiff "from January 2010 through the present time." (Smith Aff. Ex. 5).  Construing all reasonable inferences in Plaintiff's favor, the record shows that Sergeant Khalil retaliated against Plaintiff within days of her protected activity[43] by requesting that she be disciplined for multiple incidents, including incidents that occurred over a year before.  Sergeant Khalil's request for discipline is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 68 (citations and quotation marks omitted), and the "temporal proximity" of the request to Plaintiff's complaint is sufficient to support Plaintiff's allegation of a causal connection at the *prima facie* stage. *Kaytor*, 609 F.3d at 552.  Construing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Plaintiff's March 2011 complaint against Sergeant Khalil prompted his retaliation and led to all of the progressive incidents of discipline that occurred thereafter—including the three-day unpaid suspension and ultimately her termination.

---

[43] The exact date of Plaintiff's interview with Lieutenant Ewanciw and Chief Bethencourt is not clear from the record.  However, it is clear that Plaintiff complained to Lieutenant Schuh on March 8, 2011. (Plaintiff First Disc. Hr'g Tr. at 1524).

Assuming *arguendo* that Defendants have met their burden of proffering "legitimate non-retaliatory reason[s] for the adverse employment action[s]," *Kaytor*, 609 F.3d at 552-53 (citation omitted), the burden shifts back to Plaintiff to show that retaliation was "a but-for cause" of the adverse employment actions.  Plaintiff has met her burden here.  A reasonable juror could conclude that Sergeant Khalil would not have submitted his March 2011 memorandum requesting discipline against Plaintiff for multiple previous incidents, and would not have requested that Plaintiff be disciplined for particular acts of insubordination in June 2011 and October 2011, had she not first submitted a complaint against him in March 2011.  A reasonable juror could also conclude that Sergeant Khalil's retaliation led to harsher punishments down the line.  For example, the Board wrote in its decision to terminate Plaintiff that it was "significant" that Plaintiff had engaged in repeated acts of insubordination during a relatively close time period.  Plaintiff has, therefore, sufficiently established, for purposes of summary judgment, "that the adverse action[s] would not have occurred in the absence of [a] retaliatory motive." *Zann Kwan*, 737 F.3d at 846.

Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's claim for retaliation under Title VII.

## F.  Retaliation under Section 1983

The Second Circuit recently clarified that "retaliation claims alleging an adverse action because of a complaint of discrimination are actionable under § 1983." *Vega*, 801 F.3d at 80. After the "state action" requirement is met, retaliation claims under Section 1983 generally parallel retaliation claims under Title VII. *Id.* at 82.  The Court has already established that Defendants were "acting under color of state law," *see* Section IV(C)(i), *supra*, and that Plaintiff's Title VII retaliation claim survives summary judgment, *see* Section IV(E), *supra*.

Therefore, the only remaining question is whether the City of Middletown, as a municipality, and the individual Defendants, as individuals, may be held liable under Section 1983.

As to municipal liability, the Court denies Defendants' motion for summary judgment as to Plaintiff's claim against the City of Middletown for retaliation under Section 1983 for the reasons discussed in Section IV(C)(ii), *supra*.

As to individual liability, Plaintiff must show that each individual was "personal[ly] involve[d]" in the retaliation and acted with "discriminatory purpose." *Reynolds*, 685 F.3d at 204 (citation omitted).  The Second Circuit has made clear that retaliation against an employee for her discrimination complaint is, by its very nature, intentional discrimination. *Vega*, 801 F.3d at 82 ("When a supervisor retaliates against an employee because he complained of discrimination, the retaliation constitutes intentional discrimination against him for purposes of the Equal Protection Clause.").  Here, as noted in Section IV(C)(i), *supra*, the record does not contain any evidence that the Board members acted with any discriminatory or retaliatory purpose in terminating Plaintiff.  The record is similarly devoid of any evidence that Lieutenant Metakes or Lieutenant Ewanciw acted with discriminatory or retaliatory intent during their investigations. Therefore, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim for retaliation under Section 1983 against Mayor DeStefano, Commissioner Cummings, Commissioner Vignola, Commissioner McCarey, Commissioner Green, Lieutenant Metakes and Lieutenant Ewanciw.

However, the record does contain sufficient evidence for a reasonable juror to infer that Sergeant Khalil and Chief Bethencourt acted with a retaliatory motive.  As noted in Section IV(E)(ii), *supra*, the record supports an inference that Sergeant Khalil retaliated against Plaintiff within days of her protected activity by submitting a memorandum requesting that she be

disciplined for multiple incidents, and that he further retaliated against Plaintiff by requesting specific discipline against her in June 2011 and October 2011.  The record also contains sufficient evidence that Chief Bethencourt acted with retaliatory animus against Plaintiff after she formally complained about Sergeant Khalil in March 2011.  For example, Plaintiff testified that Chief Bethencourt acted "very hostile" towards her during the March 2011 interviews, (Plaintiff First Disc. Hr'g Tr. at 1525-27), and Attorney Grant testified that during the July 2011 meeting, Chief Bethencourt exhibited "abusive" and "demeaning" conduct, and his behavior was something Attorney Grant "hadn't seen [in] 20 years in meetings with chiefs." (Grant Dep. at 12-13, 23).  Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's claim for retaliation under Section 1983 against Sergeant Khalil and Chief Bethencourt.

## G.  Retaliation under the NYHRL

Plaintiff also asserts a claim against all Defendants for retaliation pursuant to the NYHRL. (Complaint ¶ 81).  The NYHRL provides that it is "an unlawful discriminatory practice for any person . . . to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article." N.Y. Exec. Law. § 296(7).  "Retaliation claims under . . . [NYHRL] are analyzed under the same 'burden-shifting' framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (citations omitted) (alteration in original).

However, the Second Circuit has declined to decide whether the "but-for" causation standard that applies to Title VII retaliation claims also applies to retaliation claims under the NYHRL.  Prior to the establishment of the "but-for" causation standard, a plaintiff only had to demonstrate that "a retaliatory motive played a part in the adverse employment actions."

*Kleehammer v. Monroe Cty.*, 583 F. App'x 18, 21 (2d Cir. 2014) (summary order) (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). This is a lower standard and easier for Plaintiff to meet than the "but-for" causation standard. *Cf. Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (stating that the "motivating factor" standard for Title VII gender discrimination claims is a "lessened causation test" when compared with the "but-for" causation standard). Although it is not clear whether the "but-for" causation standard applies to Plaintiff's retaliation claim under the NYHRL, because we have found sufficient evidence to allow Plaintiff's Title VII retaliation claim to go forward, it is clear that there is sufficient evidence to satisfy the lesser standard as well. Therefore, the Court denies Defendants' motion for summary judgment as to Plaintiff's NYHRL retaliation claim against the City of Middletown under the analysis detailed in Section IV(F), *supra*.

As noted in Section IV(D), *supra*, the NYHRL allows for individual liability under the "employer" and "aider and abettor" provisions. N.Y. Exec. Law. §§ 296(1)(a), (6). In order to be liable under the aider and abettor provision, an individual must have actually participated in the retaliation. *Rojas*, 660 F.3d at 107 n.10 (2d Cir. 2011) ("an individual defendant may be held liable under the aiding and abetting provision of the [NYHRL] if he actually participates in the conduct") (citation omitted); *Hozier v. Pratt Indus. (USA)*, No. 10 Civ. 3874 (TLM), 2012 WL 2049498, at *1 n.1 (E.D.N.Y. June 6, 2012) ("an individual defendant may be held liable for retaliation under the [NYHRL] . . . if he actually participates in the conduct giving rise to the plaintiff's retaliation claim.") (citations and quotation marks omitted). Additionally, to qualify as an "aider and abettor" under the statute, the individual must "share the intent or purpose of the principal actor" and his participation must be "direct [and] purposeful[.]" *Hassan*, 2012 WL 1190649, at *6.

63

As noted in Section IV(D), *supra*, none of the individual Defendants can be defined as "employers" under the NYHRL.  Additionally, the Board members, Lieutenant Metakes and Lieutenant Ewanciw cannot be considered "aiders and abettors" of any retaliatory action under the NYHRL because the record does not support an inference that these individuals acted with retaliatory intent against Plaintiff. *See* Section IV(F), *supra*.  On the other hand, the Court has found sufficient evidence to support an inference that Sergeant Khalil and Chief Bethencourt intentionally retaliated against Plaintiff. *See* Section IV(F), *supra*.  The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's NYHRL retaliation claim against Mayor DeStefano, Commissioner Cummings, Commissioner Vignola, Commissioner McCarey, Commissioner Green, Lieutenant Metakes and Lieutenant Ewanciw, and denies Defendants' motion for summary judgment as to Plaintiff's NYHRL retaliation claim against Sergeant Khalil and Chief Bethencourt.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  The Court grants Defendants' motion for summary judgment as to Plaintiff's claims for hostile work environment under Title VII, Section 1983 and the NYHRL against all Defendants; grants Defendants' motion for summary judgment as to Plaintiff's claims for gender discrimination under Section 1983 and the NYHRL against Mayor DeStefano, Commissioner Cummings, Commissioner Vignola, Commissioner McCarey, Commissioner Green, Chief Bethencourt, Lieutenant Metakes and Lieutenant Ewanciw; and grants Defendants' motion for summary judgment as to Plaintiff's claims for retaliation under Section 1983 and the NYHRL against Mayor DeStefano, Commissioner Cummings, Commissioner Vignola, Commissioner McCarey, Commissioner Green, Lieutenant Metakes and Lieutenant Ewanciw.

The Court denies Defendants' motion for summary judgment as to Plaintiff's claims for gender discrimination and retaliation against the City of Middletown under Title VII, Section 1983 and the NYHRL; denies Defendants' motion for summary judgment as to Plaintiff's claims for gender discrimination against Sergeant Khalil under Section 1983 and the NYHRL; and denies Defendants' motion for summary judgment as to Plaintiff's claims for retaliation under Section 1983 and the NYHRL against Sergeant Khalil and Chief Bethencourt.  The Court also denies Plaintiff's motion to strike and denies Defendants' motion to strike as moot.

All claims against Mayor DeStefano, Commissioner Cummings, Commissioner Vignola, Commissioner McCarey, Commissioner Green, Lieutenant Metakes and Lieutenant Ewanciw have been dismissed and they are hereby terminated from the case.  The clerk is respectfully requested to terminate the pending motion (Docket No. 46).

Dated:    March 31, 2016
          White Plains, New York

                                        SO ORDERED:

                                        _____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge

65